(No. 26430.—

JOHN ANDERMAN *et al.* Appellees, *vs.* THE CITY OF CHI-
CAGO, Appellant.

*Opinion filed January 20, 1942—Rehearing denied March 11, 1942.*

WILSON, J., dissenting.

BARNET HODES, Corporation Counsel, (JAMES A. VELDE, LOUIS H. GEIMAN, and JOHN F. O'MALLEY, of counsel,) for appellant.

HARVEY K. COUSENS, for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Plaintiffs brought suit in the circuit court of Cook county to restrain the city of Chicago and its officers from enforcing the provisions of the city's zoning ordinance in so far as it prohibits them from using their property as a two-family dwelling. They charged that, as applied to their property, the ordinance violates the State and Federal constitutional guaranties of due process, and is confiscatory. Plaintiffs had applied to the commissioner of buildings of the city of Chicago for a permit to complete the second floor of the building so it could be used by another family separate from the first floor and this permit was denied. The board of appeals then denied application for a variation from the zoning ordinance, and this suit followed. The chancellor granted the prayer for an injunction, and certified that the validity of a municipal ordinance was involved and that the public interest required a direct appeal to this court.

The facts are not substantially in dispute. In 1923, the city of Chicago enacted a comprehensive zoning ordinance, by which the city was divided into four classes of districts: (1) Residence districts, (2) apartment districts, (3) commercial districts and (4) manufacturing districts. In a residence district no building shall be erected or altered which is intended to be used "except for R uses or special uses exclusively as hereinafter provided." "R" or residence

uses are classified as R-1, R-2, R-3 or R-4. An R-1 use "shall include every use as a dwelling house." A "dwelling house" is defined as "A building used or intended to be used as a home or residence in which all living rooms are accessible to each other from within the building and in which such living rooms are accessible without using an entrance vestibule, stairway or hallway that is designed as a common entrance vestibule or common stairway or common hallway for more than one family, and in which the use and management of all sleeping quarters, all appliances for cooking, ventilating, heating, or lighting, other than a public or community service, are under one control." A "family" is defined as "One or more individuals living, sleeping, cooking and eating on the premises as a single housekeeping unit."

Section 7, entitled "Auxiliary Uses in Residence or Apartment Districts," states "Auxiliary uses which do not alter the character of the premises in respect to their use for residential purposes shall be permitted in Residence and Apartment districts." Among the auxiliary uses permitted is "The renting of one or more rooms or the providing of table board in a dwelling or apartment occupied as a private residence, provided no window or other display or sign is used to advertise such use."

In the 1923 ordinance the property here involved was zoned for apartment buildings. However, on March 18, 1938, this ordinance was amended so as to place appellees' property in a residential district. The amendment affected 105 lots, which were included in a strip less than a block wide and about four blocks long. The strip is bounded on the east by an alley just west of Austin avenue, on the north by an alley south of Belmont avenue, on the west by Meade avenue and on the south by Wellington avenue. Appellees' lot is located on the north side of the street at 6020 Barry avenue, which runs east and west. The property to the north and east of this aforesaid strip is zoned

for commercial uses, and begins only 100 feet east of appellees' lot. The property to the south and west is zoned for apartment buildings. Austin avenue, which is 225 feet from appellees' east lot line, is a busy street. Immediately west of appellees' property are two two-apartment buildings which were erected before 1938. In this same block are at least two two-story houses, but these are occupied by single families. Appellee John Anderman testified there are three or four other buildings in the same block with the property in question where there are two families living in one house. One block south of appellees' property is a four-apartment building. The rest of the 105 lots affected by the 1938 amendment are either vacant or are improved with one-family dwellings.

Anderman bought his lot November 14, 1939. In October before he bought, he went to the office of the building department of the city of Chicago and was there informed this property was zoned for apartments. He asked where he might buy a zoning book, and bought one at the city library on the tenth floor of the same building. This book, which stated it was corrected to January 1, 1938, showed the property in question was in an apartment district. Anderman also submitted his plans for the building to the building department and the health department, and they marked the plans "Approved." These plans showed the building was to have twelve full-sized windows on the second floor, an inner front stairway, an outer rear stairway, and drain and soil pipes leading to the second floor. Anderman did not know his property was included in the new residential district until he was told by the owner of the adjoining apartment building, and this was after he had fully constructed the building, excepting the interior of the second floor. It is conceded that if the second floor were finished for the use of another family, the exterior appearance of the building would be unchanged. Real estate experts testified such completion

would enhance the value of the property from its present value of $8000 to $10,500 or $11,000. This would be due to the increased investment and the additional income. These witnesses also testified that if the outside appearance remained as it is, the value of surrounding property would not be affected by the change from a one-family to a two-family residence. Anderman testified he had been unable to sell this property as a single residence because of the adjoining apartment buildings and because of the fear that his building could not be made a two-family apartment. From the photographs in evidence the Anderman property has the appearance of a residence rather than an apartment building. It is what is commonly called a one and one-half-story building.

The general rules of law applicable to a case of this nature are well established and are not in dispute. Municipalities may adopt zoning ordinances as an exercise of their police power and thereby impose a reasonable restraint upon the use of private property. (*Johnson* v. *Village of Villa Park,* 370 Ill. 272; *City of Aurora* v. *Burns,* 319 id. 84.) But such ordinances must have a real, substantial relation to the public health, safety, morals or general welfare. (*Western Theological Seminary* v. *City of Evanston,* 325 Ill. 511; *Forbes* v. *Hubbard,* 348 id. 166.) Whether the means employed have any real substantial relation to the public health, comfort, safety, or welfare, or are essentially arbitrary and unreasonable, is a question which is subject to review by the courts. (*Harmon* v. *City of Peoria,* 373 Ill. 594; *Merrill* v. *City of Wheaton,* 356 id. 457.) A zoning ordinance may be valid in its general aspects, yet invalid as applied to a particular piece of property and a particular set of facts. (*Johnson* v. *Village of Villa Park, supra; Ehrlich* v. *Village of Wilmette,* 361 Ill. 213.) In determining whether the invasion of property rights under a purported police power is unreasonable and confiscatory, the extent to which property values are diminished by the

provisions of a zoning ordinance must be given consideration. (*Reschke* v. *Village of Winnetka,* 363 Ill. 478.) The character of the neighborhood and the use to which nearby property is put, may also be taken into consideration. (*Forbes* v. *Hubbard, supra.*) It is further the rule that in ascertaining whether a particular zoning ordinance is in the interest of the public welfare, each case must be determined upon its own peculiar facts. (*Johnson* v. *Village of Villa Park, supra.*) And if the gain to the public is small when compared with the hardship imposed upon the individual property owner by the restrictions of the zoning ordinance, no valid basis for an exercise of the police power exists. *Evanston Best & Co. Inc.* v. *Goodman,* 369 Ill. 207.

A case similar to the one before us is *Harmon* v. *City of Peoria, supra.* The property there, by the zoning ordinance of the city of Peoria, was included in a one-family dwelling district, which contained about four times as many lots as the one in which appellees' property is located. It was one of two older well-settled residential sections of the city in which there were no stores or other business establishments. The definitions of "dwelling" and "family" in the two ordinances are practically identical. The Peoria ordinance also provided that property in a district might be devoted to uses customarily incident to any of the named uses, similar to the provision in section 2 of Chicago's zoning ordinance defining an "Auxiliary Use" as "A use customarily incidental to and accessory to the principal use of a building," etc. In that case it was conceded that in view of this provision and the one defining a boarding house as a building other than a hotel, where lodging and meals for five or more persons are served for compensation, that a family occupying a one-family dwelling might consist of the owner's immediate family and four additional persons as boarders or roomers. The property owner owned a two-story house and sought permission to

convert the second floor into two small apartments with two kitchens which would make the building a three-family dwelling. The exterior appearance was not to be changed. The city resisted on the ground the ordinance prohibited such use. The property was located near a busy street. It was shown that of the eighteen houses in the block in which plaintiff's property was located, at least half of them were used as two or three-family dwellings or lodged roomers. It was also proved that the value of surrounding property would not be affected by the occupancy of the building by three separate families any more than if the same number of people lived as one family upon the same premises, and that if the property could be used as a three-family dwelling its value would be enhanced. This court held that the zoning ordinance, as applied to plaintiff's property, was unconstitutional. It was pointed out that the term "one-family dwelling" bore no relation, in fact, to the number of persons living in a building, and that the use of plaintiff's one-family residence by six persons, maintaining three separate housekeeping units, appeared no more inimical to the public welfare than the devotion of the property to the accommodation of a family and four roomers and boarders.

Appellant seeks to distinguish the *Harmon case* from the present one in two ways. It points out that in that case half the houses in the block were used, at least in part, for income purposes. Here, only two others, located adjacent to appellees' property, are used as two-apartment buildings and in three or four other houses there were two families. Thus, in about one-third of the buildings in this block more than one family resided. That difference alone would not warrant a reversal of the decree. The other ground on which it is sought to distinguish the *Harmon case* is that in the present ordinance there is no provision permitting owners in a residential district to room or board four additional persons. No definite number is fixed in the Chicago ordinance. Instead, the provision is that the

renting of one or more rooms or the providing of table board must not alter the character of the premises in respect to the use for residential purposes. This provision is more elastic and is certainly not as restrictive as the one in the Peoria ordinance. In view of all the facts and circumstances shown in this case, it is our opinion that in forbidding appellees to complete the second floor for the use of a separate family the ordinance in question imposes an unreasonable and unconstitutional restriction on the use of their property. It is located in a small tract zoned for residential use, which is surrounded by property zoned for either commercial uses or for apartments, and the lot is near a busy street. It is adjacent to two apartment buildings. By the contemplated use its value would be increased and would have little, if any, detrimental effect on the neighborhood. The ordinance places no restrictions on the number of people or families who may reside in a building, provided they live as one housekeeping unit, have a common entrance, etc., and it expressly permits the keeping of roomers and boarders within the indefinite limitation above noted. In view of the permissible uses and the other circumstances in evidence, the restriction against the use by two separate families, with separate kitchens and bathroom facilities, is arbitrary and unreasonable.

The harshness of this classification is also illustrated by an examination of other uses to which property in a residential district may be devoted. An R-2 use is defined in section 4 as "every use as golf or tennis grounds or similar use, church, convent, parish house, public recreation building, community center building, music school, university, public school, juvenile dancing school, or a private or boarding school or college. unless such private or boarding school or college is operated so as to bring it within the definition of a C-use."

An R-4 use is "every use as a tree or plant nursery, farm, truck garden, greenhouse (unless such greenhouse is operated as a retail business), and a railway right of

way not including yard tracks or industrial tracks." Appellant claims it is reasonable to permit these uses in a residential district because of the restrictions contained in section 5 of the ordinance. That section provides that "In a Residence district no building shall be erected or used and no building shall be erected which is arranged, intended, or designed for an R-2 use unless such building or use is located" on premises situated in one of a number of alternative ways there named. One of these is that it must be located "on premises adjoining on the same street premises where there exists a building devoted to a nonconforming use." It will be observed the property here adjoins a building devoted to a non-conforming use, and thus the ordinance would permit it to be devoted to any of the R-2, as well as the R-4, uses. As was stated in *Johnson* v. *Village of Villa Park, supra,* "The capricious nature of this ordinance may be best appreciated by noticing that, under this ordinance, the property of the appellees might be used for a medical college containing a morgue and dissecting room, or a hospital with all accessory cases, which would include caring for the dead as well as the living; that it might be used for farming, with its necessary domestic animals and their attendant pollutions, or for the operation of tractors and other farm machinery. It might be used for a private club, including bowling-alleys, swimming pools, tennis-courts, etc. * * * None of these things can be properly called 'residential,' nor can we see that any of them would be less detrimental to the purposes which the police power is intended to protect than the use to which the appellees wished to devote the property."

For the reasons above indicated, the decree of the chancellor is correct, and it is affirmed.

*Decree affirmed.*

Mr. JUSTICE WILSON, dissenting.