(No. 30642.—)

METROPOLITAN LIFE INSURANCE COMPANY, Appellant, *vs.* THE CITY OF CHICAGO, Appellee.

*Opinion filed March 24, 1949.*

ECKERT & PETERSON, (OWEN RALL, and WALTER P. STEFFEN, of counsel,) all of Chicago, for appellant.

BENJAMIN S. ADAMOWSKI, Corporation Counsel, (L. LOUIS KARTON, MAURICE J. NATHANSON, and EDWARD W. PARLEE, of counsel,) all of Chicago, for appellee.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

Appellant, Metropolitan Life Insurance Company, seeks to reverse a decree of the superior court of Cook County dismissing its complaint against the city of Chicago, appellee, for want of equity after a master in chancery who heard the evidence recommended a decree in appellant's favor. Appellant sought a decree restraining enforcement of an amendatory ordinance of the city of Chicago which rezoned the property in question, changing it from "commercial" to "apartment" use, and to have the amendatory ordinance declared invalid as to the subject property and removed as a cloud upon its title. The trial court certified that the validity of a municipal ordinance was involved and that the public interest required an appeal directly to this court.

The property involved, referred to herein as the "subject property," is located in Chicago at the northwest corner of the intersection where Oak Street, Michigan Avenue,

Lake Shore Drive and Channel or Connecting Drive converge, and extends approximately 137 feet 3⅝ inches along the northerly line of Oak Street and approximately 108 feet 3⅞ inches along the westerly line of Lake Shore Drive. It is numbered 124-134 East Oak Street. Adjoining the subject property on the north, in another subdivision, is a tract also owned by appellant having the same dimensions along Lake Shore Drive with a depth of 170 feet along the southerly line of Bellevue Place, upon which is located an old mansion, formerly the home of Mrs. Edith Rockefeller McCormick. It is numbered 121 to 135 East Bellevue Place. There is also a large stable, now being used as a garage, on the latter tract. Both tracts are surrounded by a high iron fence and are also known as 1000 Lake Shore Drive. The McCormick mansion fronts on Bellevue Place which is a residential street extending from the Drive west to State Street. The rear portions of all commercial properties on the north side of Oak Street between Lake Shore Drive and Rush Street are opposite the rear of the residential properties on the south side of Bellevue Place.

From the subject property north to Lincoln Park are the following streets, in order: Bellevue Place, Cedar Street, Elm Street, Division Street, Scott Street, Goethe Street, Banks Street, Schiller Street, Burton Place and North Avenue. South from the subject property to the Chicago River are the following streets, in order: Oak Street, Walton Place, Delaware Place, Chestnut Street, Pearson Street, Chicago Avenue, Superior Street, Huron Street, Erie Street, Ontario Street, Ohio Street, Grand Avenue, Illinois Street and Hubbard Street. West from the subject property for some distance are the following streets, in order: Rush Street, State Street, Dearborn Street, Clark Street and La Salle Street.

Directly east of the subject property there are no buildings but there are three 45-foot drives and some island grassplots between it and the beach along Lake Michigan.

Michigan Avenue and Oak Street end at their intersection. A continuation of Michigan Avenue to the north past the subject property and a continuation of Oak Street east are both known as Lake Shore Drive. The Drive, according to the exhibits, makes a right-angle turn at the intersection and is of course widest from the angle point directly across to its northeasterly boundary line. It would seem that through traffic along the Drive is not required to make the right-angle turn but can follow a gradual curve to the northeast of the angle point and in so doing does not use that portion of the street adjoining the subject property.

April 5, 1923, the city of Chicago adopted a general zoning ordinance by virtue of which the subject property was placed in a commercial use district. By its amendatory ordinance of December 3, 1942, the subject property was changed to an apartment use. It was in the fourth volume district under both ordinances.

August 15, 1928, appellant loaned $500,000 to Edith Rockefeller McCormick which was secured by trust deed on the subject property and the other tract immediately north of it. Through foreclosure proceedings resulting in a master's deed dated April 5, 1938, appellant acquired title to both tracts and has been in possession thereof since that time. The subject property was used as a flower garden by Mrs. McCormick when the loan was made and has remained vacant since that time. The adjoining tract to the north upon which the old mansion is situated has been used for a number of years as a day school for children, but does not bring sufficient revenue to cover taxes.

Almost twenty years intervened between the two ordinances. Appellant placed reliance upon the use for which the property was zoned at the time of its loan, and relied upon that use continuously thereafter. It challenges the validity of the amendatory ordinance, saying that it contravenes its constitutional rights as guaranteed by sections 2 and 13 of article II of the Illinois constitution as well as

the fourteenth amendment of the United States constitution, because it deprives appellant of its property without due process of law and takes it for a public use without just compensation. Constitutional guarantees of private rights are subject to the qualification that they may be cut down by government agencies acting under a proper exercise of the police power of the State. (*Zadworny* v. *City of Chicago*, 380 Ill. 470; *Neef* v. *City of Springfield*, 380 Ill. 275.) A purchaser of land, however, may rely upon the classification which existed as to that land when the purchase was made, and upon the rule of law that its classification would not be changed so long as the basis of public welfare remained the same. *Forbes* v. *Hubbard*, 348 Ill. 166; *Offner Electronics, Inc.* v. *Gerhardt*, 398 Ill. 265.

The dividing line between commercial and apartment uses established by the ordinance of 1923 is the one which divides appellant's two tracts above referred to, the subject property and the other immediately to its north. The city states that it made a mistake in 1923 by zoning the subject property "commercial" instead of "apartment" and contends that between 1923 and 1942 conditions changed in a manner rendering the proper use of the subject property one for apartments rather than commercial. On the other hand appellant takes the position that during the intervening period the changes have contributed to the use of the subject property for commercial purposes and have rendered it less desirable or adaptable for apartment uses.

The subject property is the only piece in the immediate neighborhood changed by the amendatory ordinance. It stands diagonally across the street intersection from the Drake Hotel. It is directly across Oak Street from the Martha Weathered building, a prominent ladies' shop. Practically all of Oak Street for several blocks to the west of the subject property accommodates various business enterprises, including the Esquire Theatre and 40 East Oak Street Building, the latter having a delicatessen, a book-

shop and a beauty shop and other shops on the ground floor with furnished apartments above. The Palm Olive Building is located at the corner of Michigan Avenue and Walton Place to the south. On the west side of Michigan Avenue between Oak Street and Walton Place there are two commercial buildings, each four stories with basement accommodating stores and shops on the ground floor with offices above. In the same block is a ten-story building having Blum's ladies' dress shop on the ground floor with offices above.

In general, Michigan Avenue from the Chicago River to the subject property is a highly improved commercial district. There are some vacant properties along that portion of Michigan Avenue which may yet be used for commercial purposes, and valuable improvements along there are contemplated. Adjoining Drake Hotel on the east is a twenty-five- or thirty-story apartment building and next to it on the east is Lake Shore Drive Hotel, containing a very fine Russian restaurant, and still further to the east are other apartment buildings all the way over to the end of the block. This block is one of the most heavily populated in the city.

Lake Shore Drive from the old McCormick mansion to Lincoln Park is a residential street having many apartment houses, rooming houses and large private homes built along its westerly side. There are no buildings between the Drive and Lake Michigan north from Oak Street to Lincoln Park. During the twenty-year intervening period aforesaid there were constructed two additional 45-foot lanes making a total of three which constitute the thoroughfare known as Lake Shore Drive. The most easterly lane is known as the north-bound express, and the middle one is known as the south-bound express. The most westerly one is nearest the subject property and accomodates local traffic along with other traffic.

The extension of Oak Street east to the south-bound express is referred to as East Lake Shore Drive. From the intersection formed by the convergence of Michigan Avenue, Oak Street, Lake Shore Drive (local) and East Lake Shore Drive, another street running northeast and southwest was constructed since 1923 connecting with the south-bound express and is known as the Channel Drive or Connecting Drive. An underpass for the accommodation of pedestrians was also built under Channel Drive and the express highways to the beach. One arm of the underpass runs to the south across East Lake Shore Drive to a point near the Drake Hotel, while another runs westerly under the street intersection to a point near the subject property on Oak Street. Various traffic lights control the movement of vehicles at the intersection of the converged streets aforesaid. The testimony clearly shows that notwithstanding the additional drives and subways the traffic, both vehicular and pedestrian, has increased since 1923 on Oak Street and on Lake Shore Drive where they pass the subject property. The signal lights operate twenty-four hours each day. There is a bus stop along the east side of the subject property.

During the intervening period automobile registrations in Chicago increased from 220,346 in 1923, to 547,311 in 1942. The improvements made during that period did not simply dilute the traffic in the territory of the subject property but drew much additional traffic to that point. In a 12-hour period from 7 A.M. to 7 P.M. on November 22, 1946, a traffic count showed 35,878 vehicles (private cars, taxis, busses and trucks) passing through the last-mentioned intersection. Of the vehicles using the drive nearest the subject property there were 489 southbound motorbusses and 488 northbound motorbusses, in addition to 339 southbound busses and 334 northbound busses using the connecting Channel Drive.

As its name implies, Lake Shore Drive follows the general shore line of Lake Michigan. In its northerly course it swings sharply to the left at the easterly end of the block in which the Drake Hotel is located, runs west for a distance and then the express lanes angle back toward the north away from the subject property. From the exhibits in evidence, it appears that Lake Shore Drive is one of almost uniform width except at the aforesaid angle, and if the uniform width only be used at the curve just east of the Drake Hotel no part of the through traffic would border upon the subject property.

Lake Shore Drive is recognized as one of the finest residential streets and Michigan Avenue as one of the finest business streets in the world, and have been so recognized for many years. The subject property is near their juncture. During the intervening period traffic on Oak Street has increased as on other nearby streets and many new businesses have located thereon.

The subject property seems clearly to be influenced more by the commercial development near and adjoining it than it is by development for apartment uses. The amount of traffic on its south and east sides with the constant starting and stopping of motorbusses, taxicabs, and private automobiles would tend to making living quarters on the first several floors of an apartment at that point very undesirable.

As in practically all cases of this nature there is a conflict of evidence but the weight here shows that the subject property is much more valuable for commercial than for apartment uses; that for the former it is worth $350,000, while for the latter it would be worth only $110,000. The change in zoning has caused a reduction in its assessed valuation for the purposes of taxation causing a consequent loss of revenue to the city. The element of value is not controlling but is proper to be considered and may be persuasive in passing upon the validity of the ordinance.

(*Quilici* v. *Village of Mount Prospect,* 399 Ill. 418; *Anderman* v. *City of Chicago,* 379 Ill. 236; *Ehrlich* v. *Village of Wilmette,* 361 Ill. 213.) While cities and villages have statutory authority for the enactment of zoning ordinances, in the exercise of that right the restriction of the use of the property must bear substantial relation to the public health, safety, morals or general welfare. *Harmon* v. *City of Peoria,* 373 Ill. 594; *Forbes* v. *Hubbard,* 348 Ill. 166.

As justification for rezoning, the city points to the additional traffic lanes constructed, the subway for pedestrians and a cyclone fence separating the beach from Lake Shore Drive, and argues that these improvements have lessened traffic by the subject property. It further says that general conditions in the vicinity warrant the reclassification. It offers some evidence in support of its position but the weight of the evidence seems to be the other way. Traffic adjoining the subject property has steadily increased since 1923. In 1942 it was much heavier than when the original ordinance was adopted and has since increased. It is singular that if conditions warranted the change urged by the city they bear only on the subject property and call for no change of other nearby property. Conditions that would warrant such radical change in classification are usually of a more general nature and are not made to be felt in such limited degree. A change in zoning must be based on the public welfare. *2700 Irving Park Building Corp.* v. *City of Chicago,* 395 Ill. 138; *Anderman* v. *City of Chicago,* 379 Ill. 236; *Western Theological Seminary* v. *City of Evanston,* 325 Ill. 511.

We have considered the validity of the amendatory zoning ordinance only insofar as it applies to the subject property. It may be valid in general, but invalid as applied to that property because arbitrary and unreasonable when tested by rules of law firmly established by the prior decisions of this court. *Quilici* v. *Village of Mount Prospect,* 399 Ill. 418; *Anderman* v. *City of Chicago,* 379 Ill. 236.

In our opinion the appellant has shown by the greater weight of the evidence that the amendatory ordinance as it applies to the subject property is so arbitrary and unreasonable that it invades the rights guaranteed to appellant by both State and Federal constitutions. Such a result cannot be permitted. Should the amendatory ordinance be upheld, appellant would suffer heavy damages through the limitations imposed upon it and there would be a material loss of revenue to the city. There is no corresponding advantage to the public health, comfort, morals, safety or general welfare, nor does the public welfare require such rezoning.

The decree of the superior court of Cook County is reversed and the cause remanded to that court with directions to enter a decree enjoining the enforcement of the amendatory ordinance against the subject property and to remove it as a cloud upon the title thereto.

*Reversed and remanded, with directions.*