(No. 33084.—

WALTER S. BALTIS *et al.*, Appellants, *vs.* THE VILLAGE OF WESTCHESTER *et al.*, Appellees.

*Opinion filed May 24, 1954—Rehearing denied September 20, 1954.*

390

Schultz, Krinsley, Voorheis & Hedberg, of Chicago, (Raymond Harkrider, and Robert B. Moore, of counsel,) for appellants.

Raymond A. Smerge, Albert J. Jantorni, Edward S. Cody, and Tenny, Sherman, Bentley & Guthrie, all of Chicago, (S. Ashley Guthrie, of counsel,) for appellees.

Mr. Justice Bristow delivered the opinion of the court:

This is a direct appeal from a decree of the superior court of Cook County dismissing, for want of equity, a suit to enjoin the villages of Westchester and Broadview from selling water to La Grange Park and to enjoin the

village of Westchester from constructing a water tower or standpipe for storage of water and from issuing revenue bonds to pay the cost thereof.

Inasmuch as the constitutionality of a State statute is in issue and the trial court has also certified that the validity of a municipal ordinance is involved and that the public interest requires the appeal to be taken directly to this court, the appeal properly comes here.

The village of Westchester, with approximately a population of 8300 and an area of 2115 acres, lies 13 miles west and to the south of the Loop district of Chicago, Illinois. The village of Broadview, with a population of 7000 and an area of some 960 acres, adjoins Westchester on the east. The village of La Grange Park, with a population of about 8700 and an area of approximately 1630 acres, adjoins Westchester on the south.

Each of said villages lie within the Chicago Sanitary District, wherein the city of Chicago owns a system of waterworks and procures water from Lake Michigan.

On August 15, 1927, the city of Chicago entered into a contract with the villages of Westchester and Broadview jointly for a 25-year period wherein Chicago agreed to furnish water to said villages jointly in a quantity not to exceed 500,000 gallons per day, to be taken between the hours of 10 P.M. and 6 A.M.

In November thereafter, the villages of Westchester and Broadview entered into a contract with each other for their joint water supply and joint operation of a waterworks wherein Westchester was to obtain the right-of-way and to construct a 16-inch main from the Chicago connection to First Avenue and Roosevelt Road in Broadview, and Broadview was to have perpetual easement therein. Broadview was to construct a 16-inch main from that point to the western limits of Broadview and Westchester was to have a permanent easement therein. The village of Westchester was also to obtain a site in Broadview and

to construct thereon a 500,000 gallon underground concrete reservoir, and Broadview was to have the right to use the land not needed for the use of the waterworks for park purposes. Westchester was also to construct a 100,000-gallon elevated tank, Broadview to lease the site to the water commission at $10 a year. The contract also provided for the waterworks system to be operated by a joint commission, which was to have exclusive jurisdiction of the 16-inch main from the Chicago city limits to the waterworks, and each village was to pay said commission for water used by it.

Each village also installed and paid for its own water supply system, consisting of feeder mains, fire hydrants, necessary connections, etc., within its own corporate limits.

Such water system was completed and ready for use by 1928 at a total cost to Westchester of an amount in excess of $860,000, all of which was financed and paid for by special assessments against various lots and parcels of land in the respective villages pursuant to the statute concerning local improvements.

This water system also serves Hines and Vaughn Hospitals, which were originally part of Broadview but later disconnected. These hospitals have their own 700,000-gallon underground water reservoir and 185,000 gallons of elevated storage. Since they are not directly involved in the issues here in question, further details concerning their water supply and arrangements need not be elaborated.

In 1935 the village of La Grange Park requested to be supplied with water from the Westchester water system. On October 17, 1935, the villages of La Grange Park, Westchester, and Broadview entered into a contract whereby Westchester and Broadview permitted La Grange Park to connect to the water system of Westchester and to draw not to exceed 100,000,000 gallons of water per year nor to exceed 350,000 gallons of water per day to supply consumers in the village of La Grange Park, said contract

to be effective until August 15, 1952, and to be subject to all the terms of the contract between the city of Chicago and Westchester and Broadview. By said contract, La Grange Park was to make and maintain all of its own connections with the water system, was to pay the joint water commission $900, was not to pump water from the system without the written permission of the water commission, was to pay the villages of Westchester and Broadview for the water taken at specified rates, and in the event the supply should become insufficient, La Grange Park was to bear its prorata deficiency.

Thereafter, on March 2, 1936, the contract between the city of Chicago and the villages of Westchester and Broadview jointly was amended, whereby the city of Chicago, at the joint request of the villages, agreed to furnish an additional 500,000 gallons of water per day for the purpose of furnishing a water supply to La Grange Park through the mains of Westchester and Broadview, the only other material change in the contract being that said water was to be taken through 24 hours of the day at an even rate of flow but on the same terms.

By 1950, the population and demand for water in the three villages had increased to such an extent that their water supply systems were becoming inadequate. Westchester caused its engineers to make a study and survey of the water shortage problem and on August 31, 1950, the engineers rendered a report which found, among other things, that the water problem in Westchester was due (1) to heavy draw of water by La Grange Park, and (2) to inadequate supply of water from Chicago.

Inasmuch as the original agreement for the supply of water to La Grange Park expired by its terms on August 15, 1952, the villages of Westchester and Broadview entered into a new agreement under date of November 13, 1951, with La Grange Park for an additional period of 10 years, or until August 15, 1962, whereby Westchester

and Broadview continue to permit La Grange Park to maintain its connections with the Westchester system and to draw water therefrom, not to exceed 300,000,000 gallons per year, or 1,200,000 gallons per day. Otherwise, the new contract was substantially the same as the earlier one.

On December 6, 1951, Allan Blair and Company, a municipal bond house, hereinafter referred to as Blair, submitted to the trustees of Westchester and Broadview a proposal for marketing water revenue bonds to finance proposed improvements to the water system, which proposal was accepted by the villages.

In substance, the proposal was that Blair would assist in financing the program by, among other things, (a) analyzing past revenues, expenses, etc., and estimating future earnings, from which it would recommend the method of financing and prepare amortization schedules; (b) it would analyze present rate structures and make recommendations for future rates which would produce sufficient revenue and allow for operation costs, contingencies, and depreciation funds to service the proposed bond issue; (c) at its expense, it would engage nationally recognized municipal bond counsel to prepare all legal proceedings required to be taken to legally authorize and issue the bonds, and one of its representatives would attend meetings of the boards and supervise the passage and execution of all legal documents; (d) it would gather all data necessary to obtain an approving legal opinion on any bonds issued and would pay the cost of obtaining such opinion and provide printed bonds; (e) it would develop a plan of publicity designed to effectively set forth the facts and reasons to obtain public support for the program and would assist in the execution of such plan; (f) the revenue bonds were to bear 3, 3½, and 4 per cent interest per annum according to their maturity date and the bond house would purchase such bonds in an amount sufficient to finance all costs of the proposed improvements to the

water system and pay par and accrued interest therefor; subject, however, to the condition that, inasmuch as a substantial amount of time would elapse prior to the issuance of bonds, the bonding house reserved the right to adjust the interest cost produced by such interest rates by increasing or decreasing the same by an amount equivalent to the increase or decrease in bond yields as shown by the Dow-Jones municipal bond index as published weekly in the *Wall Street Journal* from such index as of the date of the proposal, and such index as last published prior to the date of the delivery of the bonds. If, for any reason, the bonds were not issued, the villages were to be under no obligation to the bond house for expenses incurred or services rendered, and time limits were specified by which the bonds would be issued.

On August 26, 1952, the trustees of Westchester received another communication from Blair which referred to the previous agreement for the purchase and sale of water revenue bonds to pay the cost of constructing certain improvements to the water system, and recited that since that time it had been determined that $165,000 principal amount of water revenue bonds of the village of Westchester should be authorized for those purposes and set forth the maturities of the proposed bonds. The letter also proposed in consideration of $3900 to be paid to Blair when the bonds were issued that the interest rate on the bonds should be changed to 3⅜ per cent instead of 3, 3½ and 4 per cent as originally proposed. In all other respects the original agreement was to remain in full force and effect, including the adjustment of interest costs in accordance with the Dow-Jones municipal bond index changes. This proposal of August 26, 1952, was accepted by Westchester on the same date.

The same day, the Westchester trustees, acting pursuant to article 78 of the Revised Cities and Villages Act, (Ill. Rev. Stat. 1953, chap. 24, par. 78-1 *et seq.,*) adopted

a standpipe ordinance wherein they recited that the water system of the village should be improved by the construction of a 1,500,000 gallons standpipe and other appurtenant and incidental improvements; that the estimated cost was $190,000; that the village had on hand $25,000 to apply toward the cost, and in order to raise the remainder of the funds it would be necessary to issue water revenue bonds in the amount of $165,000. The ordinance then provided that for the purpose of paying part of the cost of the improvements there should be issued and sold water revenue bonds of the village in the principal amount of $165,000, to bear interest at 3⅜ per cent per annum and to mature serially over a period of twenty years. The ordinance is quite lengthy and will not be set out or analyzed in detail at this point. Numerous assignments of error involve this ordinance, and those portions under attack will be discussed further in the latter part of this opinion when those particular errors are considered.

The standpipe ordinance was published on September 4, 1952, and shortly thereafter a petition was filed asking that the question of such water supply system improvements and the issuance of revenue bonds therefor be submitted to a referendum.

Pursuant to such petition for referendum, the village, on October 14, 1952, passed an ordinance calling a special election to be held on November 15, 1952. Said ordinance established five voting precincts and polling places, appointed the judges and clerks of election for each precinct, directed the clerk to give notice of the election by publishing notice once and posting in three public places at least fifteen, and not more than thirty, days before the election, specifying the notice to be given and the form of ballot to be used. At the election, a total of 2,388 votes were cast on the proposition, of which 1224 were cast in its favor and 1149 against, and 15 were spoiled. Thereafter, con-

tracts for the construction of the standpipe were awarded by the village.

The village proposes to construct the standpipe on some lots previously conveyed to the village and situated in George F. Nixon & Company's 22nd Street Addition to Westchester. These lots have a frontage of approximately 250 feet on the north side of Canterbury Street between Kensington and Downing Avenues extended, and are 125 feet deep to a 20-foot vacated alley at the north. North of the alley and outside the village limits lies the Oakridge Cemetery, and then north and to the west lies Hillside Golf Club. Nixon & Company's 22nd Street Addition contains a little less than 80 acres, divided into about 448 lots, some of which were later resubdivided. This particular subdivision is zoned for one-family residences under the Westchester zoning ordinance. Also, there are certain alleged restrictive and protective covenants of record concerning the use of said property.

Appellants' brief contains fourteen assignments of errors and thirty-four points which in summary may be considered to raise the following general issues: First, does Westchester have the power to sell water to La Grange Park? Second, is article 78 of the Revised Cities and Villages Act constitutional? Third, is the Westchester standpipe ordinance valid? Fourth, is the contract with Blair, the bond salesman, valid?

In approaching a consideration of these problems, we have in mind the well-established principle that municipal corporations exercise only delegated and limited powers and, in the absence of express statutory provisions to that effect, courts are authorized to indulge in no presumptions in favor of the validity of their ordinances. If in conformity with the express or necessarily implicit grant in the charter they are valid; otherwise not. (*City of Earlville* v. *Radley,* 237 Ill. 242.) We also have in mind the

equally well-established principle that a municipal corporation owning and operating a water system and selling water to individuals, although engaged in a public service, does so in its business or proprietary capacity, not in any governmental capacity, and no distinction is to be drawn between such business whether engaged in by a municipality or by a private corporation. *City of Chicago* v. *Ames,* 365 Ill. 529; *Rockford Savings and Loan Assn.* v. *City of Rockford,* 352 Ill. 348; *Sanitary District of Chicago* v. *Carr,* 304 Ill. 120; *Springfield Gas and Electric Co.* v. *City of Springfield,* 292 Ill. 236.

The villages of Westchester, Broadview and La Grange Park, as well as the city of Chicago, are all situated within the Chicago Sanitary District, and the power of Westchester to sell water to La Grange Park under the circumstances in this case turns upon the proper construction and interpretation of section 26 of the Sanitary District Act of 1889. (Ill. Rev. Stat. 1953, chap. 42, par. 348.) Said section 26, as amended, reads as follows: "Any city, village, or incorporated town located in any such sanitary district which owns a system of waterworks and procures its supply of water from a lake or other source which will be saved from sewage pollution by the construction of the sewage facilities provided by this Act shall furnish water to any other city, village, township, incorporated town or other municipal corporation within the boundaries of any such sanitary district in such quantities as may be required to supply consumers within said territory at no greater price or charge than said city, village, or incorporated town charges and collects from consumers within its limits through meters for like large quantities; provided, however, that any such city, village, township, incorporated town or other municipal corporation making application for the sale of water to it shall be required to build or cause to be built suitable and sufficient water mains to the corporate limits of such city, incorporated town or village

so owning a system of waterworks and supplying water as aforesaid to connect with the water mains and receive the water from such city, incorporated town or village."

Appellants construe this section as granting a limited power to the city of Chicago, the limitation being twofold: first, that Chicago has no power to sell water to a municipality for the purpose of resale to consumers outside the territory of the purchasing municipality; and second, that Chicago has no power to sell water to a municipality that does not have mains at Chicago's corporate limits.

A reading of the statutory section in question does not permit of such a limited interpretation and construction. The section, first of all, refers to any city, village or incorporated town located in the sanitary district. All of the villages here in question qualify in that respect. A further requirement is that such a municipality must own a system of waterworks. Under the ruling of this court in *Simpson v. City of Highwood,* 372 Ill. 212, the term "system of waterworks" as used in the statute includes such a system as the one owned and operated by the village of Westchester. There is the further requirement that such municipality must procure its supply of water from a lake or other source which will be saved from sewage pollution by the construction of the sewage facilities provided by the act. Westchester does not procure its supply of water from a lake. However, Westchester does procure its water from another source which is saved from sewage pollution by construction of the sanitary district's sewage facilities. The source of Westchester's supply of water is directly the city of Chicago, and, indirectly, Lake Michigan, both of which are saved from sewage pollution by the sewage facilities constructed under the Sanitary District Act. As observed by this court in *City of Chicago v. Town of Cicero,* 210 Ill. 290, and *People ex rel. Longenecker v. Nelson,* 133 Ill. 565, both as an historical fact and as a fact plainly shown by the terms of the act itself, the sanitary district

scheme was formulated mainly, if not exclusively, with reference to the sanitary condition and needs of the city of Chicago and its environs, and we cannot give proper construction to the act without taking into account the peculiar situation of the territory which the sanitary district of Chicago embraces. It seems apparent that the village of Westchester, in obtaining its water directly from the city of Chicago, obtains its water from a source that has been saved from sewage pollution by the construction of the sewage facilities of the sanitary district. Under such circumstances, the village of Westchester is authorized by the statute to furnish water to any other municipality within the boundaries of the sanitary district in such quantity as may be required to supply consumers within such other municipality at the rates prescribed by the statute, on the sole condition that the other municipality shall build or cause to be built proper water mains to the corporate limits of Westchester.

This conclusion is further supported by the opinion of this court in *City of Chicago* v. *Town of Cicero,* 210 Ill. 290, wherein section 26 of the Sanitary District Act was held constitutional. In that case it was observed that this section was drawn on the theory that the right to use the taxes collected from the territory outside of Chicago in constructing a system to afford a pure water supply almost wholly for the benefit of the city of Chicago would compensate that city for the burden of being obliged to furnish water to the people of adjacent municipalities.

The only Illinois authority cited by appellants to sustain their position is *Gage* v. *Village of Wilmette,* 233 Ill. App. 123, in which it was held that a village had no power to sell water outside its limits under the provisions of the Municipal Ownership Act. However, such statement was by way of dictum and on appeal to this court, although the Appellate Court's decision was affirmed, we said that it was not necessary to consider the right of the village to

furnish water to persons outside of its limits in order to decide the case. (*Gage* v. *Village of Wilmette,* 315 Ill. 328.) Consequently, there is no Illinois authority sustaining appellants' position in this respect and the statutory language clearly grants such power to villages within the Chicago Sanitary District under the circumstances here existing.

Appellants also contend that article 78 of the Revised Cities and Villages Act is unconstitutional because of failure to specify how notice of election shall be given, where the election shall be conducted, how judges and clerks shall be appointed, the form of the ballot, and how the return shall be made or canvassed, and fails to refer to any other law or laws that govern these and other matters. Section 78-4 of article 78 of the Revised Cities and Villages Act provides that if the requisite petition is filed within the specified time, the "corporate authority shall call a special election in the manner provided by law to vote upon that question." By definition in section 1-2 of the Revised Cities and Villages Act the term "corporate authorities" means "board of trustees." Under the statute therefore, the board of trustees must call and conduct the election in the manner provided by law for elections of this type. The "manner provided by law" is set forth in sections 9-1 to 9-7 of the Revised Cities and Villages Act. Sections 9-3 and 9-7 cover the objections here raised. Section 9-3 provides for the designation of the place or places of holding municipal elections, the appointment of judges and clerks thereof, and the publication of notice of election. Section 9-7 designates the procedure to be followed in special elections in cities and villages. The method of conduct of the election thus being specifically provided for in article 9 of the Revised Cities and Villages Act, which by its terms and the terms of article 78, applies to special elections called under article 78, there is no merit in the argument that article 78 is unconstitutional on the grounds alleged.

Article 78 of the Revised Cities and Villages Act authorizes any municipality with a population of less than 500,000 to acquire or purchase and to operate a waterworks system or water supply system either within or without the corporate limits thereof, and also to improve or extend that system and to pay the cost thereof by the issuance and sale of revenue bonds. Appellants contend that the proposed standpipe ordinance adopted under the terms of this statute is void, among other reasons, because the erection of the proposed standpipe will result in a useless and wasteful expenditure of public funds, is not for a proper public purpose but for a private purpose, and is therefore illegal and unconstitutional. As heretofore noted, section 26 of the Sanitary District Act of 1889 grants the power to the village of Westchester to furnish water to the village of La Grange Park upon proper application being made and a showing of general compliance with its terms. From what has heretofore been said in that respect, it is apparent that even though the purpose of the standpipe ordinance was to aid Westchester to sell water to La Grange Park, it still would be for a proper public purpose under the terms of said statute. Moreover, from the decision of this court in *Simpson* v. *City of Highwood,* 372 Ill. 212, the village of Westchester has a waterworks system within the meaning of article 78 of the Revised Cities and Villages Act and under the terms of such act has the power and authority to improve and extend that system. The determination by the Westchester board of trustees as to the need for additional water storage facilities in Westchester and as to the adequacy of the proposed standpipe to supply that need, and the passage of an ordinance to give effect to that determination constitutes an exercise of said village's legislative power and discretion granted by said statute. The exercise of such legislative discretion by a village will not be interfered with by a court except on a showing that such discretion was exercised in so

patently unreasonable a manner as to indicate that the board acted in bad faith. (*Poole* v. *City of Kankakee*, 406 Ill. 521; *City of Chicago* v. *Waters*, 363 Ill. 125; *People ex rel. Lockwood & Strickland Co.* v. *Grand Trunk Western Railway Co.* 232 Ill. 292.) In the instant case, although there is a difference of opinion between residents of the village and the board of trustees, it still appears from the evidence that the board of trustees acted on the advice of competent engineers in deciding as to the need for water storage facilities in the village and as to the means for meeting that need. In determining whether a public improvement and the steps proposed to accomplish it, as in the instant case, are needed or necessary, those words are to be construed and applied to mean expedient, reasonably convenient, and useful to the public, and cannot be limited to an absolute physical necessity. (*Dept. of Public Works and Buildings* v. *Lewis*, 411 Ill. 242.) From the evidence in the record, we cannot say that the action of the board in adopting the ordinance was so unreasonable as to indicate bad faith or that it would result in a useless and wasteful expenditure of public funds. The proposed standpipe being for a proper public purpose, this court will not interfere with the exercise of the board of trustees' legislative discretion and substitute therefor its judgment as to the need and expediency of the proposed improvement.

Appellants claim that the standpipe ordinance in question is void because its enforcement will constitute a violation of the Westchester zoning ordinance and of the vested rights of the plaintiffs acquired on the faith thereof. The Westchester zoning ordinance was adopted pursuant to article 73 of the Revised Cities and Villages Act. (Ill. Rev. Stat. 1953, chap. 24, par. 73-1 *et seq.*) Such zoning ordinance sets up the customary districts for one-family residences, two-family residences, business district and industrial district, as well as some others. The site upon which the proposed standpipe is to be erected is within the one-

family residential district, which is the most highly restricted residential district in the village. The zoning ordinance limits uses in such district to one-household living units, churches, public and parochial schools, and parks and playgrounds. In such district, height of buildings is limited to not to exceed two stories. Municipal service uses and municipal buildings are permitted in the business district and in any industrial district, but are not permitted in the one-family residential district. The Westchester zoning ordinance also contains the customary provisions for variations upon order of zoning board of appeals and other provisions required by the Illinois zoning statute in the Revised Cities and Villages Act. This court has many times held that a purchaser of property subject to a general zoning ordinance has the right to rely upon the rule of law that the classification made in the general ordinance will not be changed unless the change is required for the public good. (*Kennedy* v. *City of Evanston,* 348 Ill. 426; *Metropolitan Life Ins. Co.* v. *City of Chicago,* 402 Ill. 581; *Trust Company of Chicago* v. *City of Chicago,* 408 Ill. 91.) The appellees here contend that the zoning ordinance is inapplicable to the municipality, that the improvement is essential to provide the city and its inhabitants with an adequate fire protection system, and its inhabitants and industries with sufficient water, and was for the benefit, health, comfort and protection of its citizens and is therefore a governmental function. As heretofore noted in this opinion, it is well established that a municipal corporation owning and operating a water system does so in its business or proprietary capacity, and not in any governmental capacity, and that no distinction is to be drawn between such business whether engaged in by a municipality or by a private corporation. We have found no Illinois authority passing upon the precise question here presented and none has been cited to us. However, there are decisions from foreign jurisdictions which are very persuasive and, in our

opinion, conclusive of the decision on this point. In *Taber* v. *City of Benton Harbor,* 280 Mich. 522, 274 N.W. 324, the city proposed to erect a steel water tower and tank 140 feet high with a storage capacity of 6,000,000 gallons as an improvement to an existing municipally-owned water system, the proposed site for such water tower being in a residence district of the city. The plaintiffs in that case, residents of such residential district, commenced proceedings to enjoin the city from constructing the tank. Although the lower court dismissed the plaintiffs' complaint for want of equity, the Supreme Court of Michigan reversed the trial court unanimously. The defendants there made arguments identical to those made by the defendants in this case. In denying the validity of such arguments, the Michigan Supreme Court said as follows: "Under the circumstances in this case, no sound reason is perceived why the city should not be bound by the ordinance in question so long as such ordinance is in force and defendant is not excepted from its provisions as would be an individual or private corporation in attempting to engage upon the same project under the same conditions. It is undoubtedly true that under the provisions of the charter the city owes a duty to its inhabitants to maintain an adequate water system, but in so providing it cannot proceed in disregard of the plain legislative enactments of the duly elected representatives of its citizens."

In *O'Brien* v. *Town of Greenburgh,* 266 N.Y. 582, 195 N.E. 210, the highest court of New York unanimously affirmed a judgment of its Appellate Division (*O'Brien* v. *Town of Greenburgh,* 239 App. Div. 555, 268 N.Y. Sup. 173,) applying the same principles to an analogous situation. In the *Greenburgh case,* the city proposed to erect a garbage disposal plant on property owned by the town in a district zoned as residential by the zoning ordinance. Property owners in the town commenced proceedings to enjoin the erection of the plant. The same argument as is presented

in this case in support of the city's action was in that case likewise denied. In so holding, the Appellate Division said, in its opinion at page 558, as follows: "In reliance upon the ordinance, the district was developed pursuant to its limitations and mandates. The town now proposes to disregard its own general plan, adopted pursuant to the power delegated to it by the legislature and imposed upon the property holders of the district, claiming its right so to do from the same source of power. We think that cannot be done. * * * The right of the defendants to act under the authority conferred upon them in the disposition of garbage may not be questioned, but the wrong here involved is the contemplated erection of the plant in a restricted zone, violative of an ordinance adopted by the defendants and under which ordinance the plaintiffs acquired vested rights. The general authority conferred on the defendants to establish disposal plants did not involve an express or implied authority to establish them, or any of them, in violation of zoning ordinances adopted pursuant to the same source of power—the Legislature, and under which rights of individuals have become fixed."

The cases of *Baird* v. *Board of Appeals,* 347 Ill. App. 158, and *Decatur Park Dist.* v. *Becker,* 368 Ill. 442, cited by defendants as sustaining the standpipe ordinance in this respect, do not answer the objection made. In the *Baird case,* the court held that a zoning board of appeals properly granted a variance to a water company in Kankakee authorizing it to construct a water reservoir in a single-family residence district. Here, no attempt was made to obtain this variance from the zoning ordinance or to change the classification, but the zoning ordinance was completely ignored by the village of Westchester. In the *Decatur Park District case,* this court held that a city zoning ordinance does not interfere with the right of the park district, another municipality, to condemn for public purposes land situated in a single-family residence dis-

trict. Although such case properly held that a city zoning ordinance does not prevent the condemnation of land by another governmental unit, the question here involved is the right of a municipality in exercising a proprietary function to ignore its own ordinance and was not involved in the *Decatur case*. In our opinion, the village of Westchester, while acting in its proprietary capacity, had no power or authority to disobey or disregard its zoning ordinance on the faith of which individual persons had acquired and purchased vested rights. The right of a municipality, while acting in its governmental capacity, to disobey or disregard its own zoning ordinance is not here in issue and is not considered or passed upon directly or by inference.

Appellants also contend that the Westchester standpipe ordinance is void because it does not adequately describe the improvements or extensions to be made and no plans and specifications therefor had been prepared for that purpose, as required by article 78 of the Revised Cities and Villages Act. Section 78-3 of the Revised Cities and Villages Act provides: "The corporate authorities of any municipality availing itself of the provisions of this article shall adopt an ordinance describing in a general way the contemplated project. * * * If it is intended to build a waterworks or water supply system or to improve or extend a waterworks or water supply system owned and operated by the municipality, the ordinance shall describe in a general way the waterworks or water supply system to be constructed or the improvements or extensions to be made and refer to plans and specifications therefor prepared for that purpose. These plans and specifications shall be open for inspection by the public. The ordinance shall set out the estimated cost of the project, * * *."

From such section it is apparent that a municipality is granted the privilege, under such article 78, to improve or extend a waterworks system and to pay the cost thereof

by the issuance of water revenue bonds, on the condition that the municipality complies with the following: first, the ordinance providing therefor must describe in a general way the improvements or extensions to be made; second, plans and specifications prepared for the purpose of making such improvements or extensions must have been made and in existence at the time of adoption of the ordinance and must be available for inspection by the public; and third, the ordinance must set up the estimated cost of the project.

The ordinance in question contains a preamble in which the proposed system and improvements are described as follows: "The construction of a one-million five-hundred-thousand (1,500,000) gallon standpipe; the erection of such standpipe upon suitable concrete foundations to be constructed therefor together with appurtenant pipe and concrete construction; the construction of a booster pumping station housing two (2) three-million (3,000,000) gallon booster pumps adjacent to the standpipe, together with necessary valves, piping, and appurtenances; the construction and installation of cast-iron feeder mains, consisting of approximately 100 feet of 12-inch mains and 1300 feet of 8-inch mains with necessary gate valves, chamber, boxes, fittings and other accessories incident thereto; and the installation of altitude control valves and chamber, all in accordance with the plans and estimates of cost therefor heretofore approved by the Board of Trustees and now on file in the office of the Village Clerk for public inspection; * * *."

The preamble to the ordinance also states that the total estimated cost of the construction of the improvements is $190,000, that the village has on hand and available $25,000 to apply towards such cost, and that the village will have to borrow $165,000 to pay the remainder of the cost and issue water revenue bonds therefor. Section 1 of the ordinance provides as follows: "That the said Village of West-

chester, in the County of Cook and State of Illinois, has caused to be made an estimate of the costs of constructing improvements and extensions to the existing municipally owned waterworks system in and for said Village, such improvements and extensions being described hereinabove in the preamble of this ordinance, and all in accordance with the detailed plans and specifications therefor heretofore approved by this Board of Trustees and now on file in the office of the Village Clerk for public inspection and has heretofore estimated and does hereby estimate that the cost of said improvements and extensions is the sum of $190,000."

Two other references are made in the body of the ordinance to plans and specifications on file in the office of the village clerk in substantially the same language as above.

Appellants' objection to the sufficiency of the description of the proposed improvements or extensions in the ordinance is based largely on decisions of this court under the Local Improvement Act, such as *City of Chicago* v. *Huleatt,* 276 Ill. 466, and *City of Mattoon* v. *Stump,* 414 Ill. 319, and upon a Federal district court decision in *Illinois Power & Light Corp.* v. *City of Centralia,* 11 Fed. Supp. 874. The decisions of this court under the Local Improvement Act are to the effect that the first resolution of the board need not be as detailed as is required of the ordinance, where the improvement must be described with such particularity that a contract can be let for its construction based thereon, but that such resolution must so describe the improvement that the property owner can obtain therefrom a general understanding of what is to be done, including the character and kind of materials to be used and the extent and estimated cost of the improvement. The Federal district court case of *Illinois Power & Light Corp.* v. *City of Centralia* followed the same rule as applied under the Illinois Local Improvement Act, but

recognized that a divergence therefrom is found in cases considering situations where the statute expressly provides that it shall be sufficient to describe the property in a general way. This district court case was reversed and remanded in *City of Centralia* v. *Illinois Light & Power Co.* 89 Fed. 2d 985, without passing upon this particular question. Consequently, the Federal district court decision cannot be considered as a controlling precedent in the present situation. The question of the applicability of the restrictive provisions of the Local Improvement Act to other types of improvements was considered by this court in *Hairgrove* v. *City of Jacksonville*, 366 Ill. 163, in which an ordinance to purchase an electric light plant and for the issuance of mortgage certificates to cover the cost thereof under the Municipal Ownership Act was involved. Section 3 of the Municipal Ownership Act provided that the ordinance should "describe the plant, equipment and property proposed to be acquired or constructed," and the plaintiff objected that the description in the ordinance there involved was insufficient because of the same reasons here asserted. In holding that the ordinance there in question complied with the statutory requirement of description, we said: "Cases cited under the Local Improvement Act require such definiteness as will not only give all necessary information for bidding on construction work, but will also enable the property owner to see just what he is by special assessment required to pay for. * * * The purpose of the act [Municipal Ownership Act] concerning the ordinance and its publication is to thoroughly inform the voter of the nature and extent of the proposed utility. True, as argued by appellants, the ordinance with the plans and specifications must be sufficiently definite that neither an inferior nor more costly improvement may be constructed."

The statutory section here in issue requires only that the ordinance shall describe the project in "a general way," and shall refer to plans and specifications prepared for the

purpose of making the proposed improvements or extensions. Such requirement is less stringent as to description than is the Municipal Ownership Act referred to in the *Hairgrove case*. We believe that the statutory requirement as to description in a general way of the improvements or extensions to be made is complied with by the ordinance here in question, if the particular plans and specifications referred to in said ordinance as being on file in the office of the village clerk for public inspection are sufficiently definite to inform the voters of the nature and extent of the proposed improvements and sufficiently specific so that neither an inferior nor more costly improvement may be constructed than described.

Defendants-appellees concede that the plans and specifications referred to in the ordinance are those embodied in a report of engineers dated June 10, 1952, which was specifically approved by the Westchester board of trustees on August 12, 1952, and which was placed on file for public inspection in the village clerk's office. No other plans or specifications are referred to nor were prepared or made or placed on file. The appellants contend that the report referred to does not constitute such plans and specifications as are contemplated by the statutory section or, if they are considered as such plans and specifications, that they are insufficient. Such engineers' report consists of four pages with four tables, schedules, and drawings attached thereto. The first paragraph of said engineers' report states in substance that they are giving therewith comments and data on the necessity for the proposed water supply additions and a detailed estimate of the construction and project costs of the necessary additional water facilities. The report is broken down into three main sections, the first giving a detailed engineers' statement as to the necessity of water supply additions. The second section contains a description of the project identifying the proposed site of the project and a general description of the 1,500,000

gallon steel standpipe which is to be erected thereon and also of the booster pumping station and certain water lines and feeder mains, giving a statement of the location and size of the mains and also stating that an altitude control valve with gate valves, piping and valve chambers is to be constructed at the existing elevated tank. Section 3 contains a three-paragraph statement of the detailed estimate of project costs and refers to table 2 for a breakdown thereof. Table 1 attached sets forth water pressures available in the existing distribution system with and without the proposed standpipe; table 2 gives the detail of estimated construction and project costs; table 3 contains a general sketch as to the location and general elevation of the proposed standpipe; and table 4 is a map of the Westchester water distribution system showing the location of the proposed improvements. An examination of the alleged plans and specifications discloses that nowhere therein is the character, kind, quantity, quality, nature or amount of any materials to be used in the improvements specified. There is nothing in the ordinance or the plans and specifications sufficiently describing the proposed improvements so that neither an inferior nor more costly improvement could be constructed. The description of the project contained in such report was sufficient only to permit the engineers to accomplish the purpose intended thereby; that is, to submit comments and data on the necessity of the project and to give an estimate of the costs. This report cannot qualify as the plans and specifications contemplated by the General Assembly as being prepared for the purpose of making the improvements. It is clear that the General Assembly intended that the ordinance should describe in a general way the improvements or extensions to be made but that prior to the adoption of the ordinance detailed plans and specifications for such improvements and extensions must have been prepared for the purpose of making such improvements and made available for inspection by

the public prior to the adoption of the ordinance, in order that the voters would have the benefit of full, complete and accurate information if they wished to further investigate the proposed project and in order that once the ordinance was adopted neither an inferior nor more costly improvement could be constructed. The proposed standpipe ordinance must fail for want of any plans or specifications therefor.

It is also contended that the standpipe ordinance is void because it provides that part of the cost of the improvements shall be paid out of funds other than the proceeds of the revenue bonds, that is, from general corporate funds. Appellants' position is that article 78 of the Revised Cities and Villages Act gives no authority to a municipality to pay any part of the cost of the improvements in any manner or from any source other than the issuance and sale of revenue bonds. The standpipe ordinance and the record show that the total estimated cost of the contemplated project is $190,000, and that Westchester proposes to expend $25,000 from its general corporate funds towards the cost of the project and to finance the remainder by the issuance and sale of water revenue bonds in the amount of $165,000. Section 78-1 authorizes any municipality with a population of less than 500,000 to improve or extend a waterworks system or water supply system, as provided in said article. Section 78-2 of such act authorizes such municipality to pay the cost of such improvement or extension by the issuance and sale of revenue bonds of the municipality, payable solely from the revenue derived from the operation of the waterworks or water supply system. Section 78-3 of the act, after providing for the ordinance authorizing the project and the issuance of such bonds and requiring such ordinance, among other things, to set up the estimated cost of the project, determine its period of usefulness, and fix the amount and maturities of water revenue bonds proposed to be issued, specifies that such

revenue bonds, when issued, shall be payable solely from the revenue derived from the operation of the waterworks or water supply system on account of which the bonds are issued and that such bonds shall not, in any event, constitute an indebtedness of the municipality within the meaning of any constitutional or statutory limitation. Nothing appears in article 78 prohibiting the financing by municipalities of a waterworks system or improvements thereto by means other than revenue bonds. In fact, articles 74, 75, 76, and 77 of the Revised Cities and Villages Act each authorize the financing of such projects by general corporate borrowing and taxation. The substance of article 78 is merely that, to the extent such a municipal project is financed by revenue bonds, such bonds shall be payable solely from revenues derived from the project and shall not constitute a general corporate indebtedness. The contention made in this respect is without merit.

There are numerous other reasons assigned by appellants as to why the proposed standpipe ordinance, the ordinance providing for a special election thereon, and the special election held pursuant thereto are void. Most of such arguments are without merit, but in view of the fact that such standpipe ordinance is void for reasons hereinbefore stated, and since the construction of any improvements thereunder, the issuance of revenue bonds authorized thereby, and the entering into contracts contemplated therein should be enjoined, such further arguments advanced by appellants will not be considered.

Appellants also assign as error the holding by the trial court that the contract with Blair for the purchase and sale of water revenue bonds was valid, and insist that the same was unauthorized, illegal, and void. Inasmuch as such contract is conditioned on the issuance of the bonds under an ordinance which is void and therefore such bonds cannot be issued, such contract falls with the ordinance and there is no need to pass on such question.

We conclude that the trial court was correct in decreeing that the sale of water to La Grange Park from the Westchester supply system and the contract therefor were lawful and that article 78 of the Revised Cities and Villages Act is constitutional. However, the standpipe ordinance of August 26, 1952, is illegal and void for the reasons aforesaid, and any contracts for the construction of the improvements or extensions therein provided are likewise illegal and void. Consequently, the trial court should have issued an injunction as prayed restraining the expenditure of any funds or the incurring of any liability on behalf of the village of Westchester under or pursuant to said purported standpipe ordinance, restraining the issuance or sale of any bonds or interest coupons under or pursuant to said ordinance and contract for the sale thereof, and restraining the installation or construction of any of the improvements or extensions provided for therein.

The decree of the superior court of Cook County is affirmed in part and reversed in part and the cause is remanded, with directions to enter a decree not inconsistent with this opinion.

*Affirmed in part and reversed in part and remanded, with directions.*