TOWNSHIP OF WASHINGTON, IN THE COUNTY OF BER-
GEN, ETC., *ET ALS.*, PLAINTIFFS-RESPONDENTS, AND
BOROUGH OF HO-HO-KUS, A MUNICIPAL CORPORA-
TION OF THE STATE OF NEW JERSEY, INTERVENING
PLAINTIFF-RESPONDENT, v. VILLAGE OF RIDGEWOOD,
IN THE COUNTY OF BERGEN, ETC., *ET ALS.*, DEFEND-
ANTS-APPELLANTS.

CHARLES W. GRENZ, *ET ALS.*, PLAINTIFFS-RESPONDENTS,
v. VILLAGE OF RIDGEWOOD, IN THE COUNTY OF
BERGEN, ETC., *ET ALS.*, DEFENDANTS-APPELLANTS.

Argued February 3, 1958—Decided May 5, 1958.

Mr. *James A. Major* argued the cause for appellants (*Mr. William E. Reinhardt,* on the brief).

Mr. *Lloyd L. Schroeder* argued the cause for respondent Township of Washington *et als.*

Mr. *Marshall Crowley* argued the cause for respondents Charles W. Grenz *et als.* (*Messrs. Toner, Crowley, Woelper & Vanderbilt,* attorneys; *Mr. Marshall Crowley,* of counsel; *Mr. Robert A. Matthews,* on the brief).

Mr. *Thomas McNulty* argued the cause for intervening respondent Borough of Ho-Ho-Kus (*Messrs. Milton, McNulty & Augelli,* attorneys; *Mr. Paul A. Vivers,* on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J.  The Chancery Division of the Superior Court entered a judgment directing the Village of Ridgewood to dismantle and remove an elevated steel water tower it erected upon Van Emburgh Avenue, partially within the village and partially within the Borough of Ho-Ho-Kus. 46 *N. J. Super.* 152 (1957). Ridgewood appealed and we certified the appeal on our own motion prior to consideration of it by the Appellate Division.

Ridgewood operates a water supply system serving itself, the Boroughs of Glen Rock and Midland Park and the Township of Wyckoff, and meeting the needs of the inhabitants and municipalities, including fire fighting.  The water is obtained from deep-rock wells.  There are no reservoirs; storage to meet the increased demands of certain days or portions thereof is provided by tanks.

The pressure being inadequate, Ridgewood engaged a consulting engineer, Mr. Crew, to devise a plan for additional storage.  He recommended three tanks, all elevated, one at the Van Emburgh site here involved, another on Goffle Road in Ridgewood, and the third on the Cedarhill site in Wyckoff.  The anticipated total cost was $1,701,000.

In view of the sum involved, Ridgewood solicited the opinion of another expert, Mr. Capen. Mr. Capen, then some 1,200 miles away, was familiar with the Goffle site, and on the basis of his recollection of it, said in his report:

"In areas where elevated tanks have been established (and particularly where such installation has been made prior to nearby residential developments) repetition of the practice may well be in order. A very serious question is raised, however, in regard to placing an elevated tank in the Goffle area, near Goffle Road. There are a number of substantial residences in the vicinity which will probably be adversely affected in value by such a structure. It is therefore recommended that the entire matter of this storage be carefully reviewed and that an underground or ground level storage tank be substituted. This procedure is not a new trend but has been adopted in various residential communities."

This recommendation was explored and a decision made to shift from the Goffle site to another on Lafayette Avenue in Wyckoff, where a tank could be installed partially below ground level. The change was profitable. Instead of the Goffle tank, designed to provide storage of two million gallons at an estimated cost of $499,000, Ridgewood obtained storage of 2¼ million gallons at Lafayette at a cost of $243,672.84.

With respect to the proposed Cedarhill tank, the Board of Adjustment of Wyckoff refused approval because of objections to an elevated structure. Ridgewood thereupon selected another site where as of the time of trial a ground level tank was to be installed without increase in cost and with an increase in capacity from one million to 2¼ million gallons.

Thus as to two of the sites, objections to elevated tanks led to their abandonment in favor of tanks at or below ground level.

Mr. Capen's report was received in February 1955. In September 1955 Mr. Crew approached the governing body of Ho-Ho-Kus with respect to the Van Emburgh improvement. The testimony is not harmonious, but it is clear that the officials of Ho-Ho-Kus understood the tank would be at ground level, the same as the existing water tanks of Ho-Ho-Kus, and as such would be shielded by trees. In

the light of Mr. Capen's report, Mr. Crew should have been explicit, but was not. The board of adjustment and planning board approved, and a permit issued. The approvals were granted informally; Ridgewood concedes that the statutory requirements for a variance or exception were not met, and that if the zoning ordinance of Ho-Ho-Kus applies, it can claim no benefit from the wholly irregular grant.

When the work got under way, it was realized that an elevated structure was involved. It in fact would tower to the height of 160 feet. Ho-Ho-Kus immediately adopted a resolution rescinding the permit, and Ho-Ho-Kus and the abutting Township of Washington and residents affected instituted these actions promptly. About 75 to 85% of the structure itself was completed by the time of trial, representing a cost of some $80,000.

Three issues are involved: (1) whether the improvement violates the zoning ordinance of Ridgewood; (2) whether it violates the zoning ordinance of Ho-Ho-Kus, and (3) whether the action of Ridgewood in any event constitutes an unreasonable and arbitrary exercise of delegated power.

I.

We are satisfied that neither zoning ordinance applies. In *Thornton v. Village of Ridgewood,* 17 *N. J.* 499 (1955), a question involved was whether Ridgewood could acquire property within its one-family district for use as an administrative building and assembly hall. It was held that the zoning statute does not restrain the power of a municipality to determine where to locate municipal facilities within its borders, and hence the issue became whether the zoning ordinance itself accomplished a restriction. As the ordinance then read, "any governmentally owned or operated building" was authorized in the one-family district. It was concluded that the proposed use came within the quoted phrase.

In the course of *Thornton,* it was indicated that the phrase "governmentally owned or operated" would "seem to bar governmental buildings devoted to industrial or proprietary

use" (17 *N. J.* at *page* 514). For the obvious purpose of meeting that view, Ridgewood amended its ordinance to substitute "Any *municipally* owned or operated building, structure or use" for the phrase quoted above. There can be no doubt that the amendatory expression embraces the storage tank, and hence there is no violation by Ridgewood of its own ordinance.

██ With respect to so much of the site as is situate in Ho-Ho-Kus, it is conceded that the zoning ordinance of that municipality by its terms forbids the improvement and, as pointed out above, that the informal variance cannot be sustained. The issue accordingly is whether Ridgewood is bound by the ordinance of Ho-Ho-Kus in the use of property as part of a water supply system. We think it is not.

We see no difference between this case and *Aviation Services, Inc., v. Board of Adjustment of Hanover Township,* 20 *N. J.* 275 (1956), in which it was held that a municipality's power to establish and maintain an airport was not subject to the zoning ordinance of another municipality in which the airport was situate. In *Aviation Services,* the municipality was authorized to acquire and establish airports "within or without" its boundaries, with power to condemn. Here *R. S.* 40:62–49 provides:

"Any municipality may provide and supply water, or an additional supply of water, * * * in any one or more of the following methods:

\*  \*  \*  \*  \*  \*  \*  \*

(g) Any municipality may purchase, condemn or otherwise acquire the necessary lands, and rights or interests in lands, water rights and rights of flowage or diversion, within or without the municipality, for the purpose of a water supply, or an additional water supply, and for the connection thereof with the municipality, and in case of highway or other public or quasi public structures, may require the same to be abandoned as far as necessary for such purposes, and to be relaid, if necessary, by some other route or in some other location. * * *"

The lands necessary for "a water supply" must include lands necessary for facilities required to meet the needs of the consumer. The consent of such other municipality is re-

quired only with respect to the laying of pipes or mains "in and under any and all streets, highways, alleys and public places" in that municipality, subject to the power of the Superior Court to direct the terms of such laying if consent should be refused. *N. J. S. A.* 40 :62–65.

This result has a baneful potential, but so does a contrary holding. The problem invites a legislative solution committing the final decision to a body other than the interested municipalities themselves, but if *Aviation Services* correctly found the legislative will in that case, the same considerations dictate the same answer here.

▋ Plaintiffs urge that the supply of water is a "proprietary" rather than a "governmental" function and hence should be subject to the Ho-Ho-Kus ordinance.

We cannot agree that the distinction between governmental and proprietary functions is relevant to this controversy. The distinction is illusory; whatever local government is authorized to do constitutes a function of government, and when a municipality acts pursuant to granted authority it acts as government and not as a private entrepreneur. The distinction has proved useful to restrain the ancient concept of municipal tort immunity, not because of any logic in the distinction, but rather because sound policy dictated that governmental immunity should not envelop the many activities which government today pursues to meet the needs of the citizens. *Cloyes v. Delaware Township,* 23 *N. J.* 324 (1957). We see no connection between that classification and the problem before us. Surely the supply of water cannot be deemed to be a second-class activity in the scheme of municipal functions. Nor is it significant that the municipality serves areas in addition to its own, for from the nature of the subject, cooperative action among municipalities is imperative and consonant with the governmental nature of the activity.

## II.

██ But Ridgewood was required to act reasonably in the exercise of its authority, *Aviation Services, supra* (20

*N. J.*, at *page* 285), and the circumstance that its own interests conflicted with those of Ho-Ho-Kus and Washington emphasized that obligation. Among the considerations which Ridgewood should have weighed but in fact ignored were the zoning schemes of the municipal plaintiffs and the land uses abutting and near the site.

Mr. Crew was concerned solely with the engineering aspects. Despite Mr. Capen's *caveat* and the confirmation of it by experience with respect to the Goffle and Cedarhill sites recited above, Ridgewood made no effort to re-evaluate its plan for an elevated tank on the Van Emburgh property. The testimony shows without contradiction that the residential development there was equal or superior to that at either of the other sites and that Mr. Capen had not adverted to the interest of property owners at the Van Emburgh location only because he was not aware of that development.

Mr. Crew and Mr. Capen agreed a ground level tank could be used at Van Emburgh Avenue if pumping facilities were added. Mr. Crew stated that a gravity flow system would yield a better quality of water, but conceded that a satisfactory, wholesome supply would be furnished by ground level storage tanks. Mr. Capen made no reference to that subject and in fact had suggested pumping at the Goffle site if a ground level tank were used. The difference between the two approaches is one of cost. If the elevated tank should be used, the estimated cost for the complete installation is $226,026, whereas if the tank is placed at ground level the pumping facilities would increase the outlay to a total of $272,700. Mr. Capen would prefer to add an inlet pipe costing another $60,000 but agreed the improvement could be engineered to operate without it. The annual bill for pumping would be $5,000, less a saving of the higher maintenance costs of an elevated structure.

It appears further that immediately before trial consideration was given to alternate sites, and that one permitting a ground level tank with gravity flow operation is available at an estimated expenditure of $292,600. This exceeds the original proposal by some $66,000, part of which is at-

tributable to the increase in costs in the intervening period (and perhaps also to the inclusion of land costs; it is not clear whether the figure of $226,026 for the elevated tank installation includes the value of the land which Ridgewood had acquired back in 1940).

Hence Ridgewood could have placed the tank at ground level, either at the Van Emburgh site or the alternate site. The difference is one of cost described above. Under the circumstances, Ridgewood should have assumed that cost rather than visit the burden of an elevated structure of 160 feet upon the other municipalities. We agree with the trial court's finding that Ridgewood acted arbitrarily.

The judgment is accordingly affirmed.

HEHER, J. (for affirmance). By section 4 of the Ridgewood zoning ordinance, as amended December 8, 1953, "Any municipally owned or operated building, structure or use" is permissible in a one-family zone; and this includes a corporate or proprietary function or use as well as uses strictly governmental in nature.

As pointed out in *Reid Development Corporation v. Parsippany-Troy Hills Township,* 10 *N. J.* 229 (1952), there are cases holding that the maintenance and operation of a water system for protection against fire and other dangers to the public health and safety constitute a governmental function comprehended in the delegated local police power. But there is general agreement that the distribution of water by a municipality to its inhabitants for domestic and commercial uses is a private or proprietary activity or service which is subject to the principles and rules of conduct applicable to private corporations. This is the rule in New Jersey. *Lehigh Valley R. Co. v. Jersey City,* 103 *N. J. L.* 574 (*Sup. Ct.* 1927), affirmed 104 *N. J. L.* 437 (*E. & A.* 1928); *Fay v. City of Trenton,* 126 *N. J. L.* 52 (*E. & A.* 1941); *Mongiello v. Borough of Hightstown,* 17 *N. J.* 611 (1955). See, also, *Olesiewicz v. City of Camden,* 100 *N. J. L.* 336 (*E. & A.* 1924). And such is the case, *a fortiori,* where, as here, the water system has been con-

stituted a self-liquidating utility under *R. S.* 40:1–78, empowered to serve other municipalities as well as its own inhabitants. Compare *Morganweck v. Egg Harbor City,* 106 *N. J. L.* 141 (*E. & A.* 1929); *Cloyes v. Delaware Township,* 23 *N. J.* 324 (1957); *Borough of West Caldwell v. Borough of Caldwell,* 26 *N. J.* 9 (1958). But the operation has been held not to be within the rate-regulating function of the Board of Public Utility Commissioners. *In re Borough of Glen Rock,* 25 *N. J.* 241 (1957).

A municipally-owned and -controlled water system may not be used to supply the needs of another municipality and its inhabitants without express legislatve sanction. We do not have here a cooperative entity comprising several municipal corporations for joint operation of a water system in the common interest, a common ownership, management and service, although it does not necessarily follow that that would be a determinative circumstance. By our statute, a municipality owning and controlling its own water supply may contract for the sale and delivery of water to residents of another municipality, *R. S.* 40:62–83, or may supply water to "dwellers and other consumers of water" in other municipalities "through which its mains may pass," and "for that purpose may lay its mains and water pipes" in the streets and highways of the other municipality, *R. S.* 40:62–85, but in each of such cases only with the consent of the other municipality. And see *R. S.* 40:62–84, providing that a municipality owning and controlling waterworks may contract for such service directly with another municipality. There is no legislative mandate to do what was done here as a governmental function, either express or implied.

The weight of authority elsewhere is that in the particular circumstances the municipality acts in a proprietary or private capacity, just as would an individual or a private corporation in the prosecution of the same enterprise. *Taber v. City of Benton Harbor,* 280 *Mich.* 522, 274 *N. W.* 324 (*Sup. Ct.* 1937). And compare *O'Brien v. Town of Green-*

*burgh,* 239 *App. Div.* 555, 268 *N. Y. S.* 173 (*App. Div.* 1934), affirmed 266 *N. Y.* 582, 195 *N. E.* 210 (*Ct. App.* 1935).

In this latter case, involving a garbage disposal plant, a distinction was made "between the acts of a municipality in the performance of a governmental function carrying out a legislative mandate" and "acts which may be deemed municipal or corporate acts"; the "difference is that in the first instance the municipality is executing the legislative mandate related to a public duty generally, while in the other it is exercising its private rights as a corporate body."

A municipal corporation "owning and operating a water system" and selling water to individuals, although engaged in a public service, "does so in its business or proprietary capacity, and not in any governmental capacity, and * * * no distinction is to be drawn between such business whether engaged in by a municipality or by a private corporation." *Baltis v. Village of Westchester,* 3 *Ill.* 2d 388, 121 *N. E.* 2d 495 (*Sup. Ct.* 1954).

The distinction between governmental and proprietary functions is not necessarily the same for state and local purposes as in the application of federal statutes imposing a tax on the salaries of municipal officers and employees engaged in the performance of governmental functions, for "a federal tax in respect of the activities of a state or a state agency is an imposition by one government upon the activities of another and must accord with the implied federal requirement that state and local governmental functions be not burdened thereby." *Brush v. Commissioner of Internal Revenue,* 300 *U. S.* 352, 57 *S. Ct.* 495, 81 *L. Ed.* 691, 108 *A. L. R.* 1428 (1937).

The local legislative design to exempt the waterworks from the operation of the Ridgewood zoning ordinance is clear and imperative.

But under the Ho-Ho-Kus zoning ordinance, Ridgewood's land ownership extending into the Borough is within a zone restricted to the highest residence use, an area where dwellings range in value between $25,000 and $50,000; and

Ridgewood's planned municipal or corporate use is by its nature within the interdiction of the Ho-Ho-Kus use regulation.

In *Thornton v. Village of Ridgewood*, 17 *N. J.* 499 (1955), reference was made to the doctrine, *Bassett, Zoning, pp.* 31, 212, that municipal and state officials "usually comply with zoning requirements as a matter of comity"; the "municipality which ordains should be the first to obey its own ordinance"; but "[t]he need of a public building in a certain location ought to be determined by the federal, state, or municipal authority, and its determination on the question of necessary or desirable location cannot be interfered with by a local zoning ordinance"; no zoning ordinance, it was said, "can prevent the municipal, state, or federal government from erecting buildings in the form and on the site needed by the public." And *Yokley, Zoning Law and Practice* (2d ed.), § 40, was there cited for the proposition that the local police power in this regard is subject only to "the supreme law of the land or a definitely fixed legislative policy of the state." The subjection of the municipality to its own zoning regulations is in accord with principle and sound policy where the use or function is inherently corporate or proprietary. Ordinarily, a local law authorizing the use of lands or a building in a given zone for a municipal purpose may be regarded as an amendment or repeal of the zoning ordinance, *pro tanto*, although the doctrine of reasonable classification may then be involved, depending on the nature of the use and the circumstances. *Reichelderfer v. Quinn*, 287 *U. S.* 315, 53 *S. Ct.* 177, 77 *L. Ed.* 331, 83 *A. L. R.* 1429 (1932); *Lees v. Sampson Land Co.*, 372 *Pa.* 126, 92 *A. 2d* 692, 40 *A. L. R. 2d* 1171 (*Sup. Ct.* 1952). There is no occasion now to consider the operation of this principle under our zoning statute, prescribing as it does the mode and manner of effecting changes in a local zoning ordinance. *R. S.* 40:55–35, as amended by *L.* 1948, *c.* 305.

And the corollary theorem is that Ridgewood's land in Ho-Ho-Kus is bound by the use-restriction to residences of

the highest class laid down in the Borough's zoning ordinance. We are not here concerned with a water source vital to the essential public welfare, but rather the storage of water for distribution by the pressure of gravity, the alternative, for reasons of cost alone, to underground or ground-level distribution that in structure and mechanism would not be so violent in its intrusion upon the character of the zone district and the essential rights of those who had established their dwellings there in reliance on the reserved use.

In *Baltis v. Village of Westchester, supra,* the Supreme Court of Illinois said of a proposed water-storage standpipe, having a capacity of 1,500,000 gallons, in its own first-class residence zone:

"* * * This court has many times held that a purchaser of property subject to a general zoning ordinance has the right to rely upon the rule of law that the classification made in the general ordinance will not be changed unless the change is required for the public good."

There, also, it was contended that the planned facility was necessary to provide the city with adequate fire protection and sufficient water for its inhabitants and industries, and was therefore a governmental function. The court held, quoting from the Michigan case of *Taber v. City of Benton Harbor, supra,* that the city, in this service, acted in its municipal or proprietary capacity, and was bound by its own zoning ordinance "so long as such ordinance is in force and [it] is not excepted from its provisions as would an individual or private corporation in attempting to engage upon the same project under the same conditions"; it is "undoubtedly true that under the provisions of the charter the city owes a duty to its inhabitants to maintain an adequate water system, but in so providing it cannot proceed in disregard of the plain legislative enactments of the duly elected representatives of its citizens." The New York case of *O'Brien v. Town of Greenburgh, supra,* was cited for the principle.

Thus it is that, in this activity, Ridgewood is engaged in a municipal or corporate function, and in the pursuit of the endeavor it is bound equally with all others, individual or corporate, by the terms of the Ho-Ho-Kus zoning ordinance. There is no statutory exemption, either express or implied, from the operation of the Ho-Ho-Kus use limitation. *R. S.* 40:62–65, as amended by *L.* 1953, *c.* 37, merely authorizes the extension of pipes and mains in and under the streets of another municipality "for the purpose of connecting its waterworks with the pipes and mains so laid or to be laid" for the supplying of water "in one or more of the methods" provided by the statute, but only with the consent of the other municipality. There is provision for a review in case such consent is refused in the Superior Court, and affirmative action on terms.

There is not here an exertion of delegated state power that by the legislative will is not subject to the local use-zoning process, as in *Town of Bloomfield v. New Jersey Highway Authority,* 18 *N. J.* 237 (1955), and *Hill v. Borough of Collingswood,* 9 *N. J.* 369 (1952). See, also, *Decatur Park District v. Becker,* 368 *Ill.* 442, 14 *N. E. 2d* 490 (*Sup. Ct.* 1938).

I have a different view of *Aviation Services, Inc., v. Board of Adjustment of Hanover Township,* 20 *N. J.* 275 (1956). There, Morristown's airport operation in Hanover Township was an exercise of the authority conferred by *R. S.* 40:8–1 *et seq.* A municipality is thereby empowered, *R. S.* 40:8–2, as amended by *L.* 1947, *c.* 85, to acquire and operate airports and landing fields "within or without the limits of [the] municipality" and, *R. S.* 40:8–4 and 40:8–5, to "acquire property for such purpose or purposes under the power of eminent domain as and for a public necessity." And the holding was that the "absence of any language which would limit a municipal airport undertaking, either within or without its boundaries, and the bestowal of the power of eminent domain to subserve the program all reflect legislative intent to immunize the acquisition and maintenance from the zoning power," but that the authority

"must be reasonably exercised in response to the public need * * *." Compare *Petition of City of Detroit,* 308 *Mich.* 480, 14 *N. W. 2d* 140 (*Sup. Ct.* 1944).

There is no showing, none whatever, that Ridgewood's lands in Ho-Ho-Kus are "necessary for facilities required to meet the needs of the consumer." It does not matter that Ridgewood is now the owner of the lands in Ho-Ho-Kus. If it were not in such ownership, on what principle could Ridgewood condemn this particular piece of land in Ho-Ho-Kus for water storage purposes, notwithstanding the zoning limitation? *R. S.* 40:62–49(g) authorizes a municipality to purchase, condemn or otherwise acquire "the necessary lands, and rights or interests in lands, and water rights and rights of flowage or diversion, within or without the municipality, for the purpose of a water supply, or an additional water supply, and for the connection thereof with the municipality, * * *."

This provision by its own terms has to do with water rights and rights of flowage or diversion for the purpose of a water supply and connection thereof with the municipality; and, without undertaking a more specific delineation of the terms, it is enough to say that they patently do not include the use of Ridgewood's lands in Ho-Ho-Kus for the erection of a water tower contrary to local use-zoning, to serve the inhabitants of three nearby municipalities as well as its own, and the land, if in other proprietorship, could not in this context have been condemned for such use. The condemnation statute has no such sweep. There is no showing of need for land in Ho-Ho-Kus for the given purpose, much less the land in question; presumably, the motivating consideration is the economic advantage of using land now in Ridgewood's ownership, even though in part beyond its borders in an area restricted against such use. *R. S.* 40:62–65, requiring the consent of the other municipality for the extension of pipes and mains, is significant in this regard. Why this particular provision if there be the claimed broad power to condemn? Can it be that, though consent be required for the mere extension of pipes and

mains, Ridgewood may, *ex proprio vigore,* store and distribute water to other municipalities through a plant maintained in Ho-Ho-Kus' highest class residence district? It is to be borne in mind that Ho-Ho-Kus has no interest whatever in the operation; neither it nor its inhabitants are to have water service from Ridgewood. Ridgewood may undertake to supply water to other municipalities, but not by subverting Ho-Ho-Kus' zone plan, and thus to lay the burden on its neighbor, *in invitum.* Simple justice so ordains.

Compare *R. S.* 40:55–50, which renders "public utilities" subject to such use regulations unless the Board of Public Utility Commissioners shall determine, after hearing on notice, that "the present or proposed situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public." And see *In re Borough of Glen Rock, supra.*

Indeed, Ridgewood's brief requests that, if there be an adverse determination of these issues, it be afforded time to take other measures to solve its problem, saying that "[i]t may be feasible to completely contain the structure within the Village boundaries and thus no application to Ho-Ho-Kus be necessary," a seeming concession that in itself negates peremptory need.

Local use-zoning and water power derive from the Legislature, and they are to be reconciled accordingly to advance the essential public interest; the one predominates over the other only when and to the extent directed by the over-all legislative authority. And the statute itself provides the means of modifying zoning rules and regulations. Zoning is a major constitutionally-secured public policy that is not to be sacrificed save in the service of an imperative public need recognized as such by the legislative authority.

I submit that there is no jurisdiction in equity, nor at law, for that matter, to enjoin submission by Ho-Ho-Kus (and such is a postulate of the majority opinion) to this invasion of its first-class residence zone by an alien use deemed by the court to be "reasonable" in its exercise as compared with other more conspicuous means of accomplish-

ing the same end. And if the given use of its lands in Ho-Ho-Kus is not subject to the established use-restrictions, then is it reasonable thus to outlaw a much less expensive mechanism, both as to capital outlay and cost of operation, and in the face of expert opinion evidence that "a gravity flow system would yield a better quality of water"? Compare *Wallerstein v. Westchester Joint Water Works,* 166 *Misc.* 34, 1 *N. Y. S. 2d* 111 (*Sup. Ct.* 1937). There, also, the water tower had been almost completed. And if the whole of the land so used were situated in Ridgewood, could the gravity-flow use be enjoined in equity as arbitrary on the hypothesis that since the ground-level mechanism is feasible, Ridgewood "should have assumed [the greater] cost rather than visit the burden of an elevated structure of 160 feet upon the municipalities"? The choice of means would then rest in the discretion and judgment of the local authority. It is, I would suggest, the zoning restriction established by Ho-Ho-Kus that alone restrains Ridgewood's use of the lands in question.

We have here the problem of a local political boundary dividing an expanse of land area peculiarly suitable for the highest residence use, and so zoned by the adjoining municipalities save that in one a variant use is allowable that is denied in the other, a border conflict involving something more than the mere nonconforming use of Ridgewood's land in Ho-Ho-Kus. Ho-Ho-Kus may assert its sovereignty over lands within its limits, except as otherwise ordained by the Legislature, but it cannot oppose a different use of adjacent lands in Ridgewood unless such use constitutes a nuisance—a clash of interests that suggests the wisdom of coordinate inter-municipal action for the essential common good.

I would affirm the judgment and remand the cause with direction to stay execution until plaintiff is afforded an opportunity to take such further action in the light of the foregoing considerations as it may be advised.

PROCTOR, J., joins in this opinion.

*For affirmance*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING and FRANCIS—4.

*For affirmance and remandment*—Justices HEHER, JACOBS and PROCTOR—3.