NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0661-23
                        A-0745-23

MARK CERKEZ, INDIVIDUALLY
AND ON BEHALF OF ALL
OTHERS SIMILARLY
SITUATED,

      Plaintiff-Appellant,

v.

GLOUCESTER CITY, NEW JERSEY,
GLOUCESTER CITY DEPARTMENT
OF UTILITIES d/b/a GLOUCESTER
CITY WATER DEPARTMENT,

      Defendant-Respondents.

_____

CHARLES HOFFMAN,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

      Plaintiff-Respondent,

v.

BOROUGH OF BROOKLAWN,
NEW JERSEY,

      Defendant-Appellant.

_____

|  |
|---|
| **APPROVED FOR PUBLICATION** |
| **July 19, 2024** |
| **APPELLATE DIVISION** |

Argued May 22, 2024 – Decided July 19, 2024

Before Judges Currier, Susswein and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Civil Part, Camden County, Docket No. L-1516-23.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Civil Part, Camden County, Docket No. L-0733-23.

Lewis G. Adler argued the cause for appellant Mark Cerkez (Lewis G. Adler and Perlman-DePetris Consumer Law, attorneys; Lewis G. Adler, of counsel; Paul DePetris, on the briefs).

Francis T. Jamison argued the cause for respondents Gloucester City and Gloucester City Department of Utilities (Archer & Greiner, PC, attorneys; Francis T. Jamison and James M. Graziano, of counsel and on the brief).

M. James Maley, Jr. argued the cause for appellant Borough of Brooklawn (Maley Givens, PC, attorneys; Erin Elizabeth Simone, M. James Maley, Jr., and Emily K. Givens, on the briefs).

Lewis G. Adler argued the cause for respondent Charles Hoffman (Lewis G. Adler, and Perlman-DePetris Consumer Law, attorneys; Lewis G. Adler, of counsel; Paul DePetris, on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

We consolidate these back-to-back appeals for the purpose of issuing a single opinion. The central issue in both cases is whether defendant municipalities, Gloucester City and Borough of Brooklawn, have an implied contractual (seller-consumer) relationship with the plaintiff residents to whom they distribute metered potable water. The answer to that question, in turn, determines whether plaintiffs may sue defendants under a breach-of-contract theory on the grounds that the water distributed to them contains a high level of contaminants. Both Law Division judges rendered thoughtful opinions but reached different conclusions.

The parties cite numerous precedents, some dating back more than a century. Plaintiffs rely on older cases recognizing a contractual relationship between residents and their towns with respect to water service. Defendants rely on more recent cases recognizing a different type of relationship between municipal water suppliers and residents—one that is not based on principles of contract law.

The evolving jurisprudence, moreover, must be viewed in context with the County and Municipal Water Supply Act (WSA), N.J.S.A. 40A:31-1 to -24, and the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3. The WSA, enacted in 1989, establishes a comprehensive framework governing public water systems. The TCA, enacted in 1972, prescribes limited exceptions to the

doctrine of sovereign immunity, explaining when and on what grounds municipalities can be sued.

Considering both the developing caselaw and the current pertinent statutes, we conclude that running water is not a commercial product but rather a public resource held in trust for residents. Under that paradigm, towns distributing running water to homes and businesses are performing a governmental service. They are not tantamount to private companies that sell water for profit. We thus conclude that as a matter of law, charging a fee to defray the costs for providing this governmental service does not automatically create an implied contract between municipalities and residents.[1] Accordingly, there is no basis upon which defendant municipalities may be held liable under a contract or promissory estoppel theory. We affirm the October 6, 2023 order in Gloucester City and reverse the October 3, 2023 order in Brooklawn.

---

[1] We note the issue before us is not whether municipalities may choose to enter into water service contracts with residents that would be enforceable under the Contractual Liability Act (CLA), N.J.S.A. 59:13-1 to -10. In the cases before us, there are no written contracts between residents and their respective municipalities. Nor do the ordinances adopted by defendant municipalities expressly authorize or consummate any such contractual relationship. Cf. Daniel v. Borough of Oakland, 124 N.J. Super. 69, 73 (App. Div. 1973) (where the municipal ordinance provided for "sale" of water and featured explicit contractual language). These appeals focus on whether there is an implied contract whenever a municipality distributes metered water to a resident for a fee.

A. <u>MARK CERKEZ V. GLOUCESTER CITY</u>

Plaintiff Mark Cerkez appeals an October 6, 2023 Law Division order granting defendant[2] Gloucester City's motion for summary judgment. Section 4-38A of the City's code establishes the Department of Public Works (DPW) to provide and administer municipal services. Section 4-38B establishes the Department of Utilities and authorizes it to provide water and sewer services to residents. Section 4-41.1 establishes the Division of Water and Sewer (DWS) within the DPW and authorizes it to "[o]perate and maintain the City's water supply, treatment and distribution system." DWS works with the Tax Collector to read the meters of water consumers and send bills for water consumption.

Defendant supplies residents with water from four groundwater production wells that pump water from the Potomac Raritan Magothy. A 2023 ordinance amended the rates for water consumption up to 20,000 gallons of water per quarter for different types of dwellings, rooming houses, and establishments. For example, rates for individual and multi-unit dwellings were increased from $81 to $93. After 20,000 gallons of water are used, the quarterly rates "increase on a sliding scale."

---

[2] Defendant refers to Gloucester City and Gloucester City Department of Utilities.

On May 14, 2020, defendant received a permit from the New Jersey Department of Environmental Protection (DEP) authorizing the installation of a Granular Activated Carbon Filtration System to remove perfluoronanoic acid (PFNA). The installation was completed in January 2021.

On February 1, 2021, defendant received a Notice of Non-Compliance from the DEP advising that the running annual average (RAA) of PFNA over the past year exceeded the maximum contaminant level. Defendant was given one year to lower the PFNA in the water it distributes to residents.

Residents were advised that drinking water with PFNA levels that exceeded the MCL for "many years" could result in liver, kidney, immune system, and other health problems. The notice explained residents did not need to take any corrective action but cautioned that residents with "severely compromised immune system[s]" or those with an infant, who were pregnant, or elderly, could be at an increased risk and should seek medical advice about drinking the water.

In May 2023, plaintiff filed a four-count putative class action complaint alleging defendant breached its contract with plaintiff when it sold him contaminated water and continued to sell the contaminated water after learning it was tainted. The complaint further alleged defendant violated the covenant of good faith and fair dealing, and also alleged promissory estoppel. The complaint

seeks economic damages for residents who paid for replacement sources of water and home filtration systems and products. It also seeks to compel defendant to provide uncontaminated water and to enjoin defendant from using the wells with the contaminated water when supplying water to residents.

On September 5, 2023, defendant filed a motion for summary judgment, which plaintiff opposed. The trial judge heard argument on October 6, 2023 and issued an oral decision, granting summary judgment in defendant's favor. The judge held that water was a public trust and that supplying it was a governmental function. The judge rejected plaintiff's argument that distributing potable water was distinguishable from other government services because the supplied water was metered. On October 6, 2023, the judge issued a written order granting defendant's motion and dismissing plaintiff's complaint with prejudice. This appeal follows.

B. <u>CHARLES HOFFMAN V. BOROUGH OF BROOKLAWN</u>

Plaintiff Charles Hoffman is a resident who received water from defendant Borough of Brooklawn and is the representative of the class members in this putative class action matter. By leave granted, Brooklawn appeals an October 3, 2023 Law Division order denying its motion to dismiss plaintiff's complaint for failure to state a claim under <u>Rule</u> 4:6-2.

Section 145-1 of the Borough's code requires residents to be connected to defendant's water system. Residents are instructed to file applications to initially connect to the water system with the Borough Clerk or Chief Water Clerk.

On January 12, 2023, Brooklawn received notice that a December 7, 2022 water sample exceeded the PFNA MCL. Brooklawn responded by blending water from the contaminated wells with water it purchased from uncontaminated sources. The Brooklawn Water Department issued an advisory notice to residents regarding the high PFNA. The notice explained that in 2022, the Borough received $1 million in funding from the United States Department of Agriculture so that it could "make the necessary modifications to the treatment plant to treat for P[FN]A contaminates." Although the notice informed residents that their water service would not be interrupted, it advised of health risks associated with drinking water with PFNA above the MCL. It also explained that while boiling water would not solve the problem, individuals could use bottled water and could filter their water "to remove the closely related chemical Perfluorooctanoic Acid (PFOA)" and to reduce exposure to PFNA.

On March 9, 2023, plaintiff filed its initial complaint against Brooklawn, and filed an amended complaint the same day. The putative class action complaint alleges Brooklawn sold plaintiff contaminated water. The complaint

seeks economic damages for the cost plaintiff paid for contaminated water, replacement water, and filtration systems. Plaintiff's complaint alleges breach of contract, violation of the covenant of good faith and fair dealing, and promissory estoppel. Plaintiff also sought to compel Brooklawn to provide safe water and to enjoin it from selling contaminated water.

On June 19, 2023, Brooklawn moved to dismiss the complaint for failure to state a claim under Rule 4:6-2, or in the alternative, to convert the motion to a motion for summary judgment.

The trial judge heard oral argument on the motion on July 18, August 14, and October 3, 2023. At the end of oral arguments on July 18, the judge tentatively ruled the parties had a contractual relationship. However, the judge allowed additional briefing from the parties, stating his initial decision was subject to revision.

The parties submitted supplemental briefs and documents before appearing before the judge on October 3, 2023. The judge determined that neither the WSA nor the TCA directly addressed whether a municipality's relationship with its residents is contractual, and, therefore, did not abrogate the older cases the judge had relied on in his initial decision. On October 3, 2023, the judge issued a written order denying Brooklawn's motion to dismiss the complaint but staying discovery pending the disposition of a motion for leave to

appeal by Brooklawn. On November 9, 2023, we granted leave to appeal the judge's interlocutory order denying Brooklawn's motion to dismiss. This appeal follows.

II.

We next briefly summarize the parties' contentions on appeal. Plaintiffs in both cases[3] contend these actions concern contracts, not torts, because they did not plead any tort causes of action subject to the TCA and do not seek personal injury damages. Plaintiffs argue the caselaw supports the proposition there is a contractual relationship between a municipality and the residents to whom it provides water. Plaintiffs contend that for purposes of summary judgment and a motion to dismiss for failure to state a claim, they have presented evidence establishing the elements of a breach of contract claim, alleging there was a valid contract and that the performance by the respective municipalities breached the contract. Plaintiffs stress defendants continue to sell contaminated water knowing it is contaminated, violating the implied covenant of good faith and fair dealing. Plaintiffs also contend defendants are liable under a promissory estoppel theory, alleging defendants promised to provide uncontaminated water but failed to do so.

---

[3] Plaintiffs in both cases submitted appeals briefs that were prepared by the same attorney and that are substantially identical, accounting for the different procedural postures and factual records.

Defendant Gloucester City contends the trial judge correctly ruled there is no contractual relationship between plaintiff and the City. It argues potable water is a public trust resource, not a commercial commodity, and that the municipal distribution of potable water is an essential governmental function. Gloucester City further contends its assessment of charges to defray the expense of water supply services does not constitute the commercial "sale" of a good or service. It argues published cases holding there is a contractual relationship between municipal water suppliers and residents are outdated and distinguishable. It also contends that plaintiff's contract claims are disguised products liability and implied warranty claims barred by the TCA.

Defendant Brooklawn contends it distributes water to residents by ordinance and by statute, not by contract. It also contends municipal distribution of water is a governmental service and liability for that function is governed by tort principles, not contract principles. Brooklawn maintains the WSA abrogated prior caselaw relating to implied contracts for municipal water supply service. It also notes the TCA eliminated the distinction relied upon in earlier cases between governmental and proprietary activities. Brooklawn contends plaintiff cannot recast his claims as a contract dispute to defeat application of the TCA, which renders municipalities immune from claims based on implied warranty and strict liability under N.J.S.A. 59:9-2(b). Plaintiff's stratagem,

Brooklawn argues, violates the TCA's foundational goal to avoid imposing excessive burdens on taxpayers.

III.

We preface our analysis by acknowledging the general principles governing this appeal. We adhere to familiar standards for summary judgment motions. A court must view the motion record in a light most favorable to the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995); see also R. 4:46-2(c). On appeal we apply the same perspective. Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 124-25 (2023). We review a grant of summary judgment de novo. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016).

So too we review de novo a trial court's decision on a motion to dismiss for failure to state a claim under Rule 4:6-2. Baskin v. P.C. Richard & Son, LLC, 246 N.J. 157, 171 (2021). The reviewing court should "'search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.'" Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989) (quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957)). In doing so, it should "giv[e] the plaintiff the benefit of 'every reasonable inference of fact.'"

Baskin, 246 N.J. at 171 (quoting Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 107 (2019)).

As we have noted, these cases hinge on a question of law, which we review de novo. Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 358 (2007).

IV.

Turning to substantive legal principles, "a contract is a voluntary obligation proceeding from a common intention arising from an offer and acceptance." Friedman v. Tappan Dev. Corp., 22 N.J. 523, 531 (1956). Contracts can be express or implied. See Allied Fin. Corp. v. Steel Panel Sales Corp., 86 N.J. Super. 65, 77 (App. Div. 1964).

An implied-in-fact contract is an agreement manifested by conduct rather than express written words. Wanaque Borough Sewerage Auth. v. Twp. of W. Milford, 144 N.J. 564, 574 (1996). Courts can find and enforce an implied-in-fact contract based on the parties' conduct considering the surrounding circumstances. Ibid.

New Jersey's case law relating to municipal water systems has developed over the course of more than a century. In Jersey City v. Morris Canal & Banking Co., 41 N.J.L. 66, 69 (1879), the court explained that a resident's obligation to pay for water could arise through a contract, either express or

implied. It reasoned that "a contract will arise from the actual use of water by the party sought to be charged, and may be implied from the circumstances under which it was furnished. . . ." Ibid.

Similarly, in Ford Motor Co. v. Town of Kearny, 91 N.J.L. 671, 672 (1918), the Court of Errors and Appeals explained that a lien placed on a landlord's property for the tenant's nonpayment for water must be authorized by the town's taxing power or a contract. Finding the town's taxing authority inapplicable, the Court reasoned that the lien "must derive its vitality from the sale itself, as such; that is, from contract." Id. at 673.

In Lehigh Valley R.R. Co. v. Jersey City, 103 N.J.L. 574, 575 (1927), the payment for water supplied by the city was based on a meter the plaintiff installed. The meter was found inaccurate. Ibid. The plaintiff refused to pay the difference between what it had paid and what it should have paid. Ibid.

The court held the water charge was "the subject of a contract" that "creat[ed] the relationship of seller and purchaser as between the municipality and the consumer." Id. at 576-77. The court explained,

> [t]he providing of water for extinguishing fires and electricity for lighting streets and public places are governmental functions, while the distribution of water and furnishing of electricity to its inhabitants, for a price, is the exercise of a private or proprietary function by the municipality and is governed by the same rules as apply to private corporations.

[Id. at 577.]

In Reid Dev. Corp. v. Parsippany-Troy Hills Twp., the Court acknowledged that:

> There are cases holding that the establishment of a water system and its operation for protection against fire and other dangers to the public health and safety constitute a governmental function comprehended in the police power of the municipality. City of Chicago v. Ames, 365 Ill. 529, 7 N.E.2d 294, 109 A.L.R. 1509 (Sup. Ct. 1937); Canavan v. City of Mechanicville, 229 N.Y. 473, 128 N.E. 882 (Ct. App. 1920). But there is a general agreement that the distribution of water by a municipality to its inhabitants for domestic and commercial uses is a private or proprietary function which in its exercise is subject to the rules applicable to private corporations. This is the rule in New Jersey.
>
> [10 N.J. 229, 233 (1952).]

As we have noted, the issue before us is whether an implied contractual relationship automatically arises when municipalities provide water service to residents, not whether municipalities are permitted to structure an ordinance to establish a contractual relationship. In Daniel, the mayor and council of the defendant municipality adopted an ordinance that created a water department responsible for the municipal water supply system. 124 N.J. Super. at 71. The ordinance explicitly "provided for the sale of water" and established a schedule of fees. Ibid. (emphasis added). The defendant subsequently introduced an ordinance to increase the water charges. Id. at 72.

We explained that "[c]harges by a municipality for water furnished to its customers involve a sale and arise from a contractual relationship between it and the customer." Ibid. Importantly, we determined that the defendant's ordinance included explicit contractual language, like "sale" and "contract." We noted, for example, the ordinance "requires the customer requesting service to make a written application for such service and to enter into an agreement for its continuance." Id. at 73. We emphasized, moreover, that the ordinance "describes that agreement as a 'contract.'" Ibid. Given those facts, we had no occasion to comment on whether any such contractual relationship would exist if the ordinance had not included explicit contractual language.

That brings us to more recent cases that question the continued viability of the rationale embraced in Morris Canal, Ford Motor Co., and Lehigh Valley R.R. Co. In Washington Twp. v. Village of Ridgewood, 26 N.J. 578, 584 (1958), our Supreme Court found that when supplying water, a public entity acts as government rather than as a private entrepreneur. The plaintiffs argued that the supply of water is a "proprietary" rather than a "governmental" function—the argument accepted in Lehigh Valley R.R. Co. Rejecting that distinction, the Village of Ridgewood Court stressed,

> We cannot agree that the distinction between governmental and proprietary functions is relevant to this controversy. The distinction is illusory; whatever local government is authorized to do constitutes a

A-0661-23

function of government, and when a municipality acts pursuant to granted authority it acts as government and not as a private entrepreneur. The distinction has proved useful to restrain the ancient concept of municipal tort immunity, not because of any logic in the distinction, but rather because sound policy dictated that governmental immunity should not envelop the many activities which government today pursues to meet the needs of the citizens. Cloyes v. Delaware T[wp.], 23 N.J. 324 (1957).

[Id. at 584.]

Relatedly, in K.S.B. Tech. Sales Corp. v. N. Jersey Dist. Water Supply Comm'n, 75 N.J. 272, 288-89 (1977), our Supreme Court concluded that the defendant's "activities in harnessing, treating and channeling the water to eight municipalities constitute appropriate governmental functions and purposes," reiterating that the governmental/proprietary distinction had been "discarded." In K.S.B., the Court addressed whether state bidding laws applied to purchases relating to supplying water. The Court held water is not to be treated the same as private property. Id. at 285. Instead, the Court reasoned, running water is common property owned by the people and held in trust by the government for the public's benefit. Id. at 286.

V.

We next examine the cases cited by both parties in context with the current statutes governing the distribution of potable running water and limiting when and in what circumstances residents may sue their municipalities. Adopted in

1989, the WSA authorizes municipalities to build water supply facilities, distribute water, and "establish a rate structure that provides for uniform rates, rentals, or other charges." N.J.S.A. 40A:31-10. The rates must be "uniform and equitable for the same type and class of use or service of the facilities," but can be changed from time to time. N.J.S.A. 40A:31-10.

Notably, the rate structure is not designed to reap a profit but rather to recover the "costs of acquisition, construction or operation" of supplying water and a surplus for any contingency that arises. N.J.S.A. 40A:31-10(c). In addition, a municipality may charge to connect a property to the water distribution system if the fee is uniform. N.J.S.A. 40A:31-11.

We deem it noteworthy the WSA does not describe a contractual relationship between a municipality and its residents. Cf. Daniel, 124 N.J. Super. at 73 (finding that the language of the municipal ordinance used "the language of contract"). For example, the WSA does not authorize residents to initiate a lawsuit on a contract theory. Nor does it authorize municipalities to sue residents under a breach of contract theory. We note that if there were a contractual relationship between municipalities and residents, either party could bring a breach of contract action. But the WSA does not authorize or require a municipality to initiate any such lawsuit in the event a resident fails to pay their water bill. Instead, the WSA expressly authorizes municipalities to levy liens

and discontinue service after following prescribed notice procedures. N.J.S.A. 40A:31-12(a) and (b).

Importantly, for purposes of this appeal, the WSA explicitly provides, "[l]iens levied in accordance with this section <u>shall be enforceable in the manner provided for real property tax liens in chapter 5 of Title 54 of the Revised Statutes</u>." N.J.S.A. 40A:31-12(a) (emphasis added). This shows that the remedy for a resident's failure to pay a water bill is comparable to the remedy for failure to pay taxes, suggesting the relationship between a town and resident for purposes of water service is not a commercial relationship governed by contract law principles.

This provision of the WSA also undermines the rationale in <u>Ford Motor Co</u>. In that case, the Court of Errors and Appeals was constrained to rely on a contract theory to support the town's authority to place a lien on a landlord's property when the tenant failed to pay for water the town supplied to the property. 91 N.J.L. at 672-73. Because the WSA expressly authorizes municipalities to levy liens on failure to pay water bills, N.J.S.A. 40A:31-12, it is no longer necessary to resort to a contract theory to enforce the payment of water service fees.

Relatedly, the process by which water rates are set under the WSA is inconsistent with the process for negotiating or amending a contract.

Municipalities do not need consent from individual residents before changing their water rates. Such assent, however, would be needed to change the price term of a contract.[4] "A meeting of the minds, or mutual assent is one of the required elements of . . . a contract." Knight v. New Eng. Mut Life Ins. Co., 220 N.J. Super. 560, 565 (App. Div. 1987).

We deem it especially significant that no judicial precedent issued since the adoption of the WSA has characterized a water service dispute involving municipalities and residents as a contract dispute. The absence of contract-based litigation in the modern era supports the conclusion that the WSA is inconsistent with, if not outright abrogates, the common law notion that potable water is a product sold to residents by municipalities pursuant to an implied contract. See Fu v. Fu, 160 N.J. 108, 121 (1999) ("Where . . . the purpose of a longstanding common-law rule appears to be at odds with the aim of more recent affirmative acts by the legislature governing the same field of law, it may be reasonable to conclude that the historical rule has lost some of its vitality as a statement of public policy.").

---

[4] We add that in the Brooklawn matter, the Borough's code requires residents to be connected to the public water system. That requirement is inconsistent with a contractual relationship, which, as we have noted, is characterized by "a voluntary obligation proceeding from a common intention arising from an offer and acceptance." Friedman, 22 N.J. at 531.

We acknowledge that in <u>Sun Life Assurance Co. of Canada v. Wells Fargo Bank</u>, our Supreme Court cited to the principle, "that a statute can 'abrogate a common-law principle' if it '"speak[s] directly" to the question addressed by the common law.'" 238 N.J. 157, 166 (2019) (quoting <u>U.S. v. Texas</u>, 507 U.S. 529, 534 (1993) (quoting <u>Mobil Oil Corp. v. Higginbotham</u>, 436 U.S. 618, 625 (1978))).  Plaintiffs argue the WSA does not "speak directly" to the question of whether a contractual relationship exists between municipalities and their residents.  But here, "abrogation" of the common law principles recognized in <u>Morris Canal</u>, <u>Ford Motor Co.</u>, and <u>Lehigh Valley R.R. Co.</u> occurred in judicial decisions published before the WSA was enacted.  For example, in <u>State v. E. Shores, Inc.</u>, we commented that "[i]t is difficult for us to accept a thesis that providing water for the protection against fire and other dangers is a municipal function but that providing water for domestic use is not." 164 N.J. Super. 530, 539-40 (App. Div. 1979).  And as we have noted, in <u>Village of Ridgewood</u>, our Supreme Court rejected the notion that supplying water to residents is a "proprietary" function, 26 N.J. at 584, thus effectively eviscerating the rationale undergirding <u>Lehigh Valley R.R. Co.</u>, which held that the "distribution of water . . . for a price, is the exercise of a private or proprietary function by the municipality."  103 N.J.L. at 577.

VI.

The Supreme Court's explanation in Village of Ridgewood for rejecting the distinction between governmental and proprietary functions is telling. The Court commented that the now-discredited distinction had "proved useful to restrain the ancient concept of municipal tort immunity." 26 N.J. at 584. But today, we have a comprehensive statutory framework explaining when municipalities are immune from civil liability. That leads us to consider the impact of the TCA on the question of whether the relationship between municipal water distributors and residents is governed by tort or contract principles.

In Greenway Dev. Co. v. Borough of Paramus, 163 N.J. 546, 552 (2000), the Supreme Court explained that the TCA intended to compensate tort victims while not "unduly interfering with governmental functions and without imposing an excessive burden on taxpayers." In its 1972 report, in a comment to N.J.S.A. 59:2-1, the Attorney General's Task Force on Sovereign Immunity adopted the reasoning of the California Law Revision Commission which stated that adopting a version of the TCA that imposed liability with only certain exceptions would greatly increase a public entity's expenses. Report of the Attorney General's Task Force on Sovereign Immunity 209 (1972), as reprinted in N.J.S.A. 59:2-1 note. For example, it would greatly increase a public entity's insurance costs and "would invite actions brought in hopes of imposing liability

on theories not yet tested in the courts and could result in greatly expanding the amount of litigation and the attendant expense which public entities would face." Ibid.

Notably, N.J.S.A. 59:9-2(b) explicitly states that "[n]o judgment shall be granted against a public entity or public employee on the basis of strict liability, implied warranty or products liability." The "warrant of merchantability is a warranty that the goods are reasonably fit for the general purpose for which they are sold." Adams v. Peter Tramontin Motor Sales, Inc., 42 N.J. Super. 313, 322 (App. Div. 1956) (quoting Dunbar Bros. Co. v. Consol. Iron-Steel Mfg. Co., 23 F.2d 416, 419 (2d Cir. 1928)). It is well-settled in this State that the implied warranty of merchantability "is a concept synonymous with strict liability," but in the tort context. Realmuto v. Straub Motors, Inc., 65 N.J. 336, 343 (1974). The Restatement (Second) of Torts § 402A explains that an individual "who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to [strict] liability for physical harm." Restatement (Second) of Torts § 402A (Am. Law. Inst. 1965).

The implied warranty of fitness for a particular purpose arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." N.J.S.A. 12A:2-315. Further,

N.J.S.A. 12A:2-313(1) explains that an express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods <u>and becomes part of the basis of the bargain</u>." (Emphasis added).

Applying these basic principles to the matters before us, we conclude that for all practical purposes, the theory of liability in plaintiffs' complaints, while carefully drafted to employ the terminology of contract law, is indistinguishable from a warranty of fitness cause of action. Stated another way, using the label of a contract dispute to describe the cause of action does not change its essential character or transform the relationship between municipal water suppliers and residents into a contractual one.

## VII.

In sum, we conclude that under the current governance framework for public water systems, potable water is a public resource owned by the people and held in trust for them. Defendant municipalities distribute potable water to their residents for a governmental purpose. The fact they charge residents for the costs incurred for providing this governmental service—which varies based on the amount of water a resident receives—does not create a contractual relationship. Accordingly, there is no foundation upon which contractual damages may be claimed against these municipalities. To the extent we have

not specifically addressed them, any remaining arguments made by plaintiffs lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

The October 6, 2023 Law Division order in the Gloucester City case granting summary judgment in favor of defendants is affirmed.  The October 3, 2023 Law Division order in the Brooklawn case denying defendant's motion to dismiss is reversed.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0661-23

25